**LOCAL UNION NO. 167, PROGRESSIVE MINE WORKERS OF AMERICA, Petitioner,**

**v.**

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

**No. 17372.**

United States Court of Appeals, Seventh Circuit.

Feb. 6, 1970.

Rehearing Denied Feb. 25, 1970.

G. William Horsley, Richard L. Lott, Springfield, Ill., for petitioner-appellant.

Marcel Mallet-Prevost, Asst. Gen. Counsel, Charles Steele, Atty., Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Assoc. Gen. Counsel, William F. Wachter, Atty., N. L. R. B., Washington, D. C., for respondent.

Before HASTINGS, Senior Circuit Judge, and KILEY and KERNER, Circuit Judges.

KERNER, Circuit Judge.

This case is before the court upon a petition to review and set aside an order of the National Labor Relations Board (Board) issued against petitioner Local Union No. 167, Progressive Mine Workers of America (Union) remedying a violation of § 8(b) (1) (A) of the National Labor Relations Act (Act). In its cross-application for enforcement, the Board requests the order be enforced in full. We conclude that the Board's order should be enforced.

Progressive Mine Workers of America, District No. 1 (PMW) is a labor organization comprised of a number of constituent local unions of which the petitioner Union is one. PMW has entered into a series of master collective bargaining agreements with the Coal Producers' Association of Illinois (Association), a multi-employer group. The Peabody Coal Co. (Company), while not a member of the Association has adopted these agreements by reference in its contracts.

The two mineworkers who are the objects of the alleged Union's unfair labor practice, and the charging parties, were employees at the Peabody Coal Company's Midwest Mine. The employees of the Midwest Mine are represented by the petitioner Union and at the time of the events in this case, were covered by the then current contract between the Union and the Company, incorporating the current contract between PMW and the Coal Producers' Association.

One of the employee benefit programs established by the contract between the Union and the Company is its Welfare and Retirement Pension Plan. Section 23 of the Special Allocation Plan for the Midwest Mine, governing the details of administration of the Welfare and Retirement Pension Plan, as it applies to Midwest employees, provides that "continuous Union membership" is necessary for eligibility and that "dropping of such membership shall automatically forfeit any funds then allocated or the right to any future allocations."

Melvin Bosse and Marvin Ude had worked at the Midwest Mine for more than 27 and 10 years respectively. Both men were eligible for participation in

the Welfare and Retirement Pension Plan upon retirement from the Coal Industry. On January 16, 1967, both Bosse and Ude quit their jobs at Midwest Mine and accepted jobs at another mine, at which the employees were represented by the United Mine Workers of America (UMW). By virtue of having accepted such employment, however, Bosse and Ude, both PMW members, violated the membership requirements of the PMW constitution which provides in relevant part:

> Any member of the Progressive Mine Workers of America accepting employment in the coal industry in any mine not under contract with Progressive Mine Workers of America or International Union District 101, [shall] be immediately dropped from membership.
>
> Article VI, Section 5.

On the day they quit the Midwest Mine, January 16, 1967, Bosse and Ude presented to the Union's financial secretary checks for $15.95 for their union dues for the balance of the year. Although the Union originally accepted the two employees' dues, the Union subsequently, after a three-month retention, returned the dues. The Union asserted that Bosse and Ude were no longer eligible to participate in the Welfare and Retirement Pension Plan because of their non-membership in the Union.

The Board found that the Union violated § 8(b) (1) (A) of the Act by depriving Bosse and Ude of eligibility for pension and welfare benefits because of non-membership in the Union. The Board further found that the Union's refusal to accept their tendered dues and to permit these employees to remain eligible served as a warning to other Midwest employees that they too might lose such employment benefits in the event they went to work at a UMW mine and lost their membership in the Union. In this respect also, the Board found the Union's conduct violative of § 8(b) (1) (A) of the Act.

Accordingly, the Board ordered the Union to cease and desist from the un-fair labor practices found and from in any like or related manner interfering with the Section 7 rights of the employees at the Midwest Mine. Affirmatively, the Board ordered the Union to accept the dues of Bosse and Ude as service fees if they tender them again; to notify the trustees of the Welfare and Retirement Pension Plan that Bosse and Ude have at all times met the Union's requirements for eligibility; and to post appropriate notices.

■ Section 8(b) (1) (A) of the Act states:

> (b) It shall be an unfair labor practice for a labor organization or its agents—
>
> (1) to restrain or coerce
>
> (A) employees in the exercise of the rights guaranteed in section 7: *Provided*, that this paragraph shall not impair the right of a labor organization to prescribe its own rules with respect to acquisition or retention of membership therein.

While a union is free to "prescribe its own rules with respect to the acquisition and retention of membership therein," a union violates § 8(b) (1) (A) of the Act when it deprives or threatens to deprive employees of employment benefits in order to compel them to fulfill their membership obligations, or as a punishment for their having failed to meet such obligations. *See e. g.* N. L. R. B. v. Int'l Hod Carriers, 295 F.2d 657, 658 (7th Cir. 1961); N. L. R. B. v. Int'l Union, United Auto Workers, Local 291, 194 F. 2d 698, 702 (7th Cir. 1952).

■ Here, the Union constitution provides that if a PMW member employee took a job at a mine not under contract to a PMW district or local, the employee would be dropped from PMW membership. Loss of membership, however, is not what resulted in the Board's finding of an unfair labor practice, but loss of membership also caused the employees to lose their eligibility for the Welfare and Retirement Pension Plan. The Plan, which provided that employees shall remain members of the Union as a

condition of eligibility for benefits, was interpreted by the Union as meaning that employees who were dropped from formal membership in the Union were automatically disqualified from participation in the Plan, even though they were willing to pay a service fee in the form of reduced union dues and thereby bear a portion of the cost of maintaining the Plan.

The Board's order does not require the Union to restore employees Bosse and Ude to union membership or to permit them to participate in Union affairs.[1] Its effect is simply to restore them to eligibility under the terms of the Plan, upon tender of monthly service fees in an amount equal to reduced dues —the same amount of reduced dues Schedule which the Plan makes available for employees who leave the mines to work in other vocations.[2] As the Pension Plan is presently administered, if an employee leaves the coal industry to work in another vocation, or has gone to work at another PMW mine, or has actually retired, he would eventually receive, in monthly installments, retirement benefits then allocated to him on the account books of the Plan. However, if an employee chooses to work in a UMW mine, and thus loses his Union membership, the Union causes him to lose his eligibility to participate in any welfare and pension benefits, including the retirement funds which had been allocated to him. The Board found, and we agree, that this procedure of denying welfare and pension benefits to employees who change mines and consequently change unions, coerces employees in the exercise of their § 7 rights to join or not to join a labor union and is violative of § 8(b) (1) (A) of the Act.

The Union asserts, however, that its action was justified because of the existence of a valid union security agreement between the Company and the Union as anticipated by the proviso to § 8(b) (1) (A), which states:

> Provided, that this paragraph shall not impair the right of a labor organization to prescribe its own rules with respect to the acquisition or retention of membership therein.

We disagree with the Union's assertion. The legislative history of this proviso indicates that in enacting § 8(b) (1) (A) "Congress was not trying to interfere with the internal affairs of unions, but was trying to outlaw coercive and restraining acts of unions attempting to organize unorganized employees." Price v. N. L. R. B., 373 F.2d 443, 446 (9th Cir. 1967). (See Legislative History of the Labor Management Relations Act of 1947 at pp. 1139, 1141, 1200; 93 Cong. Rec. 4398, 4400, 4433.) The Labor Board in discussing the scope of the proviso stated:

> Congressional recognition of a labor organization's right to make its own rule presumes, of course, its right to invoke them—except where the implementing of such rules is expressly prohibited, as in the case of affecting an employee's employment rights.
>
> Minneapolis Star & Tribune Co., 109 N.L.R.B. 727, 728 (1954).

Consequently, a union security agreement which restrains employees' rights to their job and job benefits and coerces employees in the exercise of their § 7 rights to join or refrain from joining a union does not fall within the protection of the proviso to § 8(b) (1) (A).

The result of the PMW's union security agreement as applied to the Union's

---

1. Consequently, the Union's contention that the Board's order raises serious problems in the face of the Labor Management Reporting and Disclosure Act of 1959, 29 U.S.C. § 401, et seq. (requiring that all union members be given equal rights to participate in certain intra-union affairs) is unfounded because it is based on the erroneous premise that the Board's order required membership be extended to employees Bosse and Ude.

2. Union members working in a PMW mine pay dues of 75¢ monthly plus 20% of their gross earnings. A lesser amount is paid by union members who leave the mines to work outside the industry—$1.45 monthly, and $1.00 per month is paid by retired or disabled employees.

Welfare and Pension Plan, restrains employees' job benefits and coerces employees in the exercise of their § 7 rights and is therefore not a valid justification for the Union's action.

The Union also contends that the Board's findings of an 8(b) (1) (A) violation must fail for want of "actual proof of restraint and coercion." This contention is without merit. This court has held that in determining whether a § 8(a) (1) or § 8(b) (1) violation has been committed, the answer does not "turn on * * * whether the coercion succeeded or failed * * * the test is whether the employer [Union] engaged in conduct which, it may be reasonably said, tends to interfere with the free exercise of employee rights under the Act." N. L. R. B. v. Illinois Tool Works, 153 F.2d 811, 814 (7th Cir. 1946, involving a § 8(a) (1) violation); accord Progressive Mine Workers v. N. L. R. B., 187 F.2d 298, 301 (7th Cir. 1951, involving a § 8(b) (1) violation). Here, the rejection of the two employees' tendered service fees not only caused loss of welfare and pension eligibility for the two employees, but served notice on other employees that they too would lose their welfare eligibility should they default in their union membership obligation by joining another mine union. We agree with the Board that the Union's practice is inherently destructive of the employees' § 7 rights and actual proof of restraint is not necessary, nor, as the Union contends, is it necessary to show that employees Ude and Bosse actually suffered a loss of wages or welfare benefits because of the discriminatory Union plan. See N. L. R. B. v. Local 815 Teamsters, 290 F.2d 99, 102–103 (2d Cir. 1961). Whether the employees actually suffered loss of benefits is immaterial if the Union's acts had discouraged these and other employees from exercising their § 7 rights. "The policy of the Act [is] * * * to insulate employees' jobs from their organizational rights." Radio Officers' Union v. N. L. R. B., 347 U.S. 17, 40, 74 S.Ct. 323, 98 L.Ed. 455 (1954).

The Union argues that unless it prevails in this case, employees who leave PMW for work in UMW mines will receive double pension coverage and, consequently, this will result in a migration of employees from one union mine to another causing a substantial depletion of their employees' pension funds. Although this argument may hold some validity, there are no assurances that an employee who transfers from a PMW mine to a UMW mine will satisfy the UMW eligibility requirements. Consequently, under the Union's present administration of its Plan, such employee would be denied retirement benefits under both plans. In addition, if employees who transferred employment did qualify for two pensions, there is nothing in the Board's order which prevents the Union and the Company from renegotiating their Pension Plan to provide for such contingencies.

Finally, the Union argues that the unfair labor practice charge against the Union is barred by the provisions of § 10(b) of the Act. Section 10(b) of the Act provides that no complaint shall issue based upon any unfair labor practice occurring more than six months prior to the filing of the charge with the Board. The Union initially accepted Bosse's and Ude's tender of dues for 1967. Subsequently, their dues were refunded on March 15, 1967, well within the six-month period preceding the filing of the charge. The Union contends, however, that the unfair labor practice in this case occurred when Bosse and Ude began work at the UMW mine in January, 1967, outside the statute-of-limitations period.

We disagree, the limitation period under § 10(b) did not begin to run when Bosse and Ude were notified of their loss of membership in PMW. The Board's finding of a violation occurred and thus the period commenced to run when Bosse and Ude were notified by the Union that their tendered dues would not be accepted and were informed that pursuant to the Union in-

terpretation, they were no longer eligible for the Plan. The Union's assertion that the loss of eligibility was automatic when the employees commenced employment at a UMW mine is untenable in the absence of any Union actions to remove the employees' names from the account books of the Plan or to advise them that they had lost their eligibility.

For the foregoing reasons, the Board's order will be enforced.

Enforcement ordered.