WISCONSIN RIVER VALLEY DISTRICT COUNCIL OF the UNITED BROTHERHOOD OF CARPENTERS AND JOINERS OF AMERICA, AFL–CIO, Petitioner,

v.

NATIONAL LABOR RELATIONS BOARD, Respondent.

No. 74–1564.

United States Court of Appeals, Seventh Circuit.

Argued Jan. 19, 1976.

Decided March 26, 1976.

**48**

Roy T. Traynor, Wausau, Wis., for petitioner.

Elliott Moore, Deputy Associate Gen. Counsel, Robert A. Giannasi and John G. Elligers, Attys., N. L. R. B., Washington, D. C., for respondent.

Before SWYGERT, SPRECHER and TONE, Circuit Judges.

SPRECHER, Circuit Judge.

This case is before the court on petition of the Wisconsin River Valley District Council of the United Brotherhood of Carpenters and Joiners of America, AFL–CIO, ("the Union") pursuant to Section 10(e) and (f), of the National Labor Relations Act ("the Act"), 29 U.S.C. § 160(e), (f), to review and set aside an Order of the National Labor Relations Board ("the Board"). The Board cross-petitioned for enforcement of its order and supplementary order issued on June 7, 1974 and June 30, 1975, respectively,[1] finding petitioner in violation of Section 8(b)(1)(B) of the Act, 29 U.S.C. § 158(b)(1)(B).

The Board, affirming and adopting the decision and order of the Administrative Law Judge, found that the Union, by restraining and coercing Skippy Enterprises, Inc., ("the Company") in the selection of its representatives for the purposes of collective bargaining and adjustment of grievances, committed unfair labor practices within the meaning of Section 8(b)(1)(B) of the Act, 29 U.S.C. § 158(b)(1)(B).

---

1. The Board's original decision and order and its supplementary decision and order are reported at 211 N.L.R.B. No. 40 and 218 N.L.R.B. No. 157 respectively.

## I

The relevant facts are not in dispute. Skippy Enterprises, Inc., maintains its principal office at Stevens Point, Wisconsin and is engaged in the building and construction industry. In March 1971, in accordance with a $600,000 contract, the Company began construction on the Madison View Apartments project in Stevens Point, Wisconsin as on-site general contractor and supplier of all carpentry, masonry and concrete work. When the project began the company employed Richard Blenker as project superintendent. Blenker quit two weeks later and journeyman-carpenter Raymond Schulist was asked by the Company President, Chester Skippy, to replace him. Schulist accepted and remained in this position until the project was completed in March 1972. As project superintendent, he was expected to run the carpentry end of the job, act as job superintendent and assume full managerial responsibility over the project. He continued to work as an hourly-rated employee receiving the journeyman carpenter's rate of pay, but was promised by Skippy, that he would be placed on salaried status as soon as the Company's financial picture improved.[2]

The Madison View Apartments project had two construction stages: the roughing-in stage and the finishing stage. During the first stage, from March 1971 to September 1971, Skippy was personally present at the site approximately 90 percent of the working time. Schulist controlled the work of one of the crews and spent 90 percent of his time physically working with the tools of his trade.[3] He also assigned work to employees on his crew, instructed them on layouts, inspected the work done by them, attended conferences along with Skippy and the architect or owner when they came to the job, and made arrangements with representatives of other subcontractors on the job to coordinate their work. During the finishing stage, Schulist spent 70 percent of his time on supervisory activities and was often the only person present at the jobsite with authority to direct work operations. Between October 1971 and January 1972, Skippy was at the worksite about 30 to 40 percent of the time and from January to March 1972 about 10 percent of the time.

In addition to assigning and directing work, as job superintendent, Schulist interviewed job applicants and made hiring and firing recommendations which were usually followed by his employer. He was empowered to assign overtime, grant time off for personal business, reschedule work in inclement weather, purchase supplies and speak to architects or inspectors visiting the jobsite. Furthermore, Schulist was authorized to resolve grievances brought to him by Company employees. For example, during the first stage of the project, without consulting Skippy, he satisfied employees' complaints regarding the inadequacy of toilet facilities. On another occasion, Schulist investigated an employee's claim for backpay and arranged for additional compensation.

In January 1972, when construction on the Madison View Apartments was in its final stage, the Union negotiated with representatives of Skippy Enterprises and other area building contractors for a new collective bargaining agreement, which covered the contractors' carpenter employees. Unlike past years, the Company found the terms of the contract unsatisfactory and refused to sign the agreement. As a result, the constituent locals of the Union adopted a "no contract-no work" policy and, on February 21, 1972, issued a notice to all their members prohibiting such members from performing any work for building contractors who refused to sign the collective bargaining agreement.

Although Schulist, a Union member, received notice of the order, he decided after conferring with Skippy, to continue working as superintendent and carpenter on the project. Three months later, in May 1972,

---

2. Schulist was not placed on salaried status until the Spring of 1973.

3. The other work crew was directed by Schulist about one day a week when its supervisor engaged in work at the office.

the Union's business representative filed a formal complaint with the Union charging that Schulist was in violation of the "no contract-no work" order. On September 15, Schulist was summoned to appear before a trial committee to defend himself. Schulist failed to appear and on September 30, the trial committee found him guilty of violating the no-work order and levied a fine of $1,300. Schulist was not notified of the verdict or the fine although he heard rumors that other Union members had been fined for violating the no-work rule.

Schulist had no notice of the fine until June 1973, when the Union instituted a lawsuit against him to collect it. Shortly after the institution of the state court action, Schulist and Skippy wrote the Union protesting the fine; however, the lawsuit was not withdrawn. The Company then filed charges with the Board alleging that the Union had violated Section 8(b)(1)(B) of the Act.

The Board concluded that the Union's fining of Schulist for failing to comply with the "no contract-no work" order constituted an 8(b)(1)(B) violation, and it issued a cease and desist order. Affirmatively, the Board ordered the Union to rescind all records of the fine, advise Schulist in writing of the recisions, post appropriate notices at the Union's office, and furnish signed copies of the notice for posting by the Company. The Board's supplementary decision and order reaffirmed its finding that the Union violated Section 8(b)(1)(B).

Our review is limited to determining whether substantial evidence supports the findings of fact. After a careful review of the record, decisions and orders of the Board, we conclude that the findings are reasonable and supported by the record as a whole.

## II

Section 8(b)(1)(B) of the Act, prohibits a union from restraining or coercing an employer in the selection of his representatives for the purposes of collective bargaining or the adjustment of grievances.⁴ The elements of a § 8(b)(1)(B) violation as enumerated by the court in *Newspaper Guild, Local 187 v. NLRB*, 489 F.2d 416, 419–420 (3d Cir. 1973), are:

> . . . (1) that the disciplined employee have § 2(11) supervisory status and (2) § 8(b)(1)(B) status as a representative for the purposes of collective bargaining or the adjustment of grievances; and (3) a showing of restraint or coercion in the selection of such a representative.

The Union's contention is that Schulist was not a member of the supervisory class whose interests are protected by Section 8(b)(1)(B). We disagree.

The term "supervisor" under Section 2(11) of the Act, 29 U.S.C. § 152(11),

> . . . means any individual having authority, in the interest of the employer, to hire, transfer, suspend, lay off, recall, promote, discharge, assign, reward, or discipline other employees, or responsibly to direct them, or to adjust their grievances, or effectively to recommend such action, if in connection with the foregoing the exercise of such authority is not of a merely routine or clerical nature, but requires the use of independent judgment.

It is not necessary that an individual possess each of the enumerated powers to establish supervisory status within Section 2(11) of the Act. In *NLRB v. Elliott-Williams Co.*, 345 F.2d 460, 463 (7th Cir. 1965) we have held:

> . . . the existence of any one of the indicia listed is sufficient to support a finding that the one possessing it is a supervisor. (Citations omitted.)

There is substantial evidence in the record to support the Board's finding that Schulist was a supervisor. Testimony credited by the Administrative Law Judge revealed

4. § 8(b)(1)(B) of the Act, 29 U.S.C. § 158(b)(1)(B) provides:

(b) It shall be an unfair labor practice for a labor organization or its agents—

(1) to restrain or coerce . . . (B) an employer in the selection of his representatives for the purposes of collective bargaining or the adjustment of grievances . . . . .

that from the time of his promotion, Schulist was vested with the authority to (1) assign, supervise and inspect, (2) make recommendations regarding hiring, lay off and discharge of employees, and (3) adjust employees' grievances. We are unconvinced that Schulist was a "mere straw boss" as the Union suggests, or that Skippy's presence at the worksite impinged upon Schulist's authority.[5]

█ Having decided that Schulist was a supervisor, we now turn to the more difficult question of whether he was an employer representative within the meaning of Section 8(b)(1)(B). The Union asserts that Schulist was removed from the protection of the Act since he performed 30 percent rank-and-file work after the "no contract-no work" order issued. As support for this proposition, the Union heavily relies on the Supreme Court's decision in *Florida Power & Light Co. v. Electrical Workers, Local 641,* 417 U.S. 790, 94 S.Ct. 2737, 41 L.Ed.2d 477 (1974). The question presented in that case was whether the unions committed unfair labor practices under § 8(b)(1)(B) when they disciplined their supervisor-members for crossing the picket lines and performing rank-and-file struck work during lawful economic strikes against the companies. Mr. Justice Stewart held that the supervisor-members fell outside the protection of the Act and stated:

> . . . that a union's discipline of one of its members who is a supervisory employee can constitute a violation of § 8(b)(1)(B) only when that discipline may adversely affect the supervisor's conduct in performing the duties of and acting in his capacity as, grievance adjuster or collective bargainer on behalf of the employer.

*Ibid.* at 804, 805, 94 S.Ct. at 2744, 41 L.Ed.2d at 488. Thus, the Union reasoned that Schulist's performance of rank-and-file work removed him from the protection of the Act.

In order to resolve the question presented here, we must review and analyze the legislative history, applicable Board decisions and relevant case law interpreting Section 8(b)(1)(B). The Senate Report explains the significance of this provision:

> [A] union or its responsible agents could not, without violating the law, coerce an employer into joining or resigning from an employer association which negotiates labor contracts on behalf of its members; also, this subsection would not permit a union to dictate who shall represent an employer in the settlement of employee grievances, or to compel the removal of a personnel director or supervisor who has been delegated the function of settling grievances.[6]

At the outset, this provision was strictly construed by the Board and reviewing courts. The Court, outlining its development in *Florida Power,* 417 U.S. at 798–799, 94 S.Ct. at 2742, 41 L.Ed.2d at 484, said:

> For more than 20 years after § 8(b)(1)(B) was enacted in 1947, the Board confined its application to situations clearly falling within the metes and bounds of the statutory language. Thus, in *Los Angeles Cloak Joint Board ILGWU (Helen Rose Co.),* 127 N.L.R.B. 1543 (1960), the Board held that § 8(b)(1)(B) barred a union from picketing a company in an attempt to force the employer to dismiss an industrial relations consultant thought to be hostile to the union . . . Similarly, the Board held that § 8(b)(1)(B) was violated by union attempts to force employers to join or resign from multiemployer bargaining associations, . . . as well as by attempts to compel employers to select foremen from the ranks of union members . . . . (Citations omitted.)

However, in 1968, the Board greatly expanded the import of § 8(b)(1)(B) with its decision in *San Francisco-Oakland Mailers' Union No. 18 (Northwest Publications,*

---

**5.** At the time of the "no contract-no work" order, Skippy was only present on the jobsite 10 percent of the time.

**6.** S.Rep.No.105, 80th Cong., 1st Sess., 1, 21 (1947), quoted in *Florida Power,* 417 U.S. at 798, 94 S.Ct. at 2741, 41 L.Ed.2d at 484.

*Inc.),* 172 N.L.R.B. 2173. In that case, the Board held that a union violated Section 8(b)(1)(B) by imposing discipline upon foremen-members for allegedly violating the contract between their employer and the union with respect to work assignments. The Board concluded, at 2174, that:

> [T]he relationship primarily affected [was] the one between the Union and the Employer, since the underlying question was the interpretation of the collective bargaining agreement between the parties. The relationship between the Union and its members appears to have been of only secondary importance, used as a convenient and, it would seem, powerful tool to affect the employer-union relationship; i.e., to compel the Employer's foremen to take prounion positions in interpreting the collective bargaining agreement. *The purpose and effect of Respondent's conduct literally and directly contravened the statutory policy of allowing the Employer an unimpeded choice of representatives for collective bargaining and settlement of grievances.* In our view it fell outside the legitimate internal interests of the Union . . . . (Emphasis added.)

The Board has consistently applied these principles in other cases finding union disciplinary actions against supervisors unlawful where they were rooted in disputes between employers and unions over the interpretation of their collective bargaining agreement.[7] As a result of these decisions, the reach of Section 8(b)(1)(B) was further extended:

> . . . *to proscribe union discipline of management representatives* both for the manner in which they performed their collective-bargaining and grievance-adjusting functions, and *for the manner in which they performed other supervisory functions if those representatives also in fact possessed authority to bargain collectively or to adjust grievances.*

\*      \*      \*      \*      \*      \*

Through the course of these decisions, § 8(b)(1)(B) thus began to evolve in the view of the Board and the courts "as a general prohibition of a union's disciplining supervisor-members for their conduct in the course of representing the interests of their employers." . . . or for acts "performed in the course of [their] management duties . . . ." (Emphasis added, citations omitted.)

417 U.S. at 800–802, 94 S.Ct. at 2742, 41 L.Ed.2d at 485. The *Oakland Mailers* decision and the principals advanced therein were not vitiated by the Supreme Court's decision in *Florida Power.* In *Florida Power,* the Court outlined the test for determining whether Section 8(b)(1)(B) violations had occurred and specifically noted:

> . . . that a union's discipline of one of its members who is a supervisory employee can constitute a violation of § 8(b)(1)(B) only when that discipline may adversely affect the supervisor's conduct in performing the duties of, and acting in his capacity as, grievance adjuster or collective bargainer on behalf of the employer.
>
> *We may assume without deciding that the Board's Oakland Mailers decision fell within the outer limits of this test,* but its decisions in the present cases clearly do not. For it is certain that these supervisors were not engaged in collective bargaining or grievance adjustment, or in any activities related thereto, when they crossed union picket lines during an economic strike to engage in rank-and-file struck work. (Emphasis added.)

7. *Teamsters Local 524,* 212 N.L.R.B. No. 133 (1974); *Pressmen's Union No. 13,* 192 N.L.R.B. 106 (1971); *Warehousemen, Local 287,* 183 N.L.R.B. 398 (1970); *Typographical Union No. 87,* 182 N.L.R.B. 592 (1970); *Sheet Metal Workers Local 49,* 178 N.L.R.B. 139 (1969), enfd., 430 F.2d 1348 (10th Cir.1970); *Lithographers, Locals 15–p and 272,* 175 N.L.R.B. 1072 (1969), enfd., 437 F.2d 55 (6th Cir.1971); cf. *Local 423, Laborer's International,* 195 N.L.R.B. 241 (1972); *Meat Cutters Local 81,* 185 N.L.R.B. 884 (1970), enfd., 458 F.2d 794 (D.C.Cir. 1972); *Mailers Local 143,* 181 N.L.R.B. 286 (1970), enfd., 445 F.2d 730 (D.C.Cir. 1971); *New Mexico District Council of Carpenters & Joiners,* 176 N.L.R.B. 797 and 177 N.L.R.B. 500 (1969), enfd., 454 F.2d 1116 (10th Cir.1972).

*Id.* at 804–805, 94 S.Ct. at 2744, 41 L.Ed.2d at 488.

■ In sum, *Florida Power* and its antecedents teach that the focus of a Section 8(b)(1)(B) inquiry rests on the nature of the supervisors' duties when discipline is imposed. Where supervisors cross picket lines to perform regular supervisory duties, union discipline violates Section 8(b)(1)(B) since it tends to deprive the employer of its supervisors' services—including their § 8(b)(1)(B) services—and because the supervisors would reasonably anticipate that union discipline would also be imposed if future performance of their § 8(b)(1)(B) functions did not meet with union approval. On the other hand, where supervisors cross picket lines to perform rank-and-file struck work, union discipline does not violate Section 8(b)(1)(B) since it merely deprives the employer of services normally rendered by strikebreaking replacement employees.

The facts in the instant case have clearly established Schulist as a supervisor who represented the Company for the purpose of grievance adjustment at the critical time. Consequently, the Board's finding that the Union's discipline interfered with Schulist's performance of bargaining and grievance-adjustment duties is reasonable and in accord with the principles set forth above.

We do not believe as the Union contends, that Schulist's performance of 30 percent rank-and-file work warrants a different result. The Union's reliance on *Florida Power* is misplaced since the supervisor-members, in that case, crossed the picket line for the *sole* purpose of performing rank-and-file struck work. Here, however, Schulist continued to perform substantially supervisory functions—a most important distinction. Similarly, the Board, in *Chicago Typographical Union No. 16 (Hammond Publishers, Inc.)*, 216 N.L.R.B. No. 149 (1975) when considering violations of this nature, said that the determinative factors were the nature and amount of work performed by the supervisor-members during the period for which the discipline was imposed. The Board, in *Hammond*, held that the Union's discipline violated Section 8(b)(1)(B) because the supervisor-members performed substantially only supervisory functions and only a minimal amount of rank-and-file work.

Hence, we fully concur with the Board's conclusion that:

> Although Schulist spent 30 percent of his time in rank-and-file work, this amount did not increase with the onset of the strike. He did not perform the struck work of rank-and-file employees; the latter in fact did not strike. In other words, Schulist's duties and work performance were not affected by the strike. He continued, as theretofore, to spend 70 percent of his time in supervisory functions. This was not a minimal amount of time spent in supervisory duties. Under these circumstances, compliance of Schulist with [the Union's] demands . . . would have meant quitting his job and thus depriving the Employer of the services of its selected representative for the purposes of collective bargaining or the adjustment of grievances.

218 N.L.R.B. No. 157 at 5.

### III

Finally, the Union complains that the unfair labor practice charge against the Union is barred by Section 10(b) of the Act, 29 U.S.C. § 160(b) which provides that:

> . . . no complaint shall issue based upon any unfair labor practice occurring more than six months prior to the filing of the charge with the Board . . . .

The Union's position is that although Schulist was fined and had notice of the fine in September 1972, a complaint was not filed with the Board until August 1973 which was four months beyond the statutory limitation period. We disagree.

■ The Act's statute of limitations does not begin to run until the aggrieved party knew or should have known that his statutory rights were violated. *N.L.R.B. v. Duncan Foundry & Machine Works, Inc.*, 435 F.2d 612, 619 (7th Cir.1970); *Alabaster*

*Lime Co.,* 194 N.L.R.B. 1116, 1118 (1972). Substantial evidence supports the Board's determination that Schulist first learned or should have learned of the fine in June 1973, when the Union instituted suit to collect it. In the instant case, it is undisputed that the Union categorically failed to formally notify Schulist of the fine. Therefore, we must consider whether the evidence supports the Union's position that he "should have" had notice of the Union's decision. We are not convinced that Schulist, having been notified of the Union hearing, lacked standing to disclaim notice of the outcome. The Union has a duty to notify a member of any action taken against him before such action becomes binding. *Local 167, Mine Workers v. NLRB,* 422 F.2d 538, 542–43 (7th Cir. 1970). Furthermore, Schulist, as a supervisor, was under no duty to respond to the Union charges against him. *Oakland Mailers, supra,* at 2173. Likewise, we are not persuaded that rumors heard by Schulist or discussed with Skippy about "fines being levied," were factually sufficient to sustain a finding of "notice" within the meaning of Section 10(b) of the Act. Finally, even if Schulist had received notice of the fine in September 1972, we believe that the Union's suit to collect the fine was a current violation of § 8(b)(1)(B) directed at punishing Schulist for defying the Union's order. *Shumate v. NLRB,* 452 F.2d 717 (4th Cir. 1971).

For the foregoing reasons, the Board's order is enforced and the petition for review is denied.

SWYGERT, Circuit Judge (dissenting).

In my opinion the unfair labor practice charge filed by the Company is barred by reason of Section 10(b) of the National Labor Relations Act.

The Board found that the Union had committed an unfair labor practice within the meaning of Section 8(b)(1)(B) of the Act by restraining and coercing the Company in the selection of its representatives for the purposes of collective bargaining and adjustment of grievances. The restraint and coercion took the form of the Union's levying a disciplinary fine against the Company superintendent, Raymond Schulist, and filing an action to collect it.

The fine was levied September 30, 1972 by a trial committee of the Union after notice had been served on Schulist ordering him to appear before the committee to answer a formal complaint for violating the "no contract, no work" rule. Schulist did not appear at the trial. He was not formally notified of either the verdict or the fine, except that in June 1973, eight months after the levying of the fine, he was served with a summons issued in an action filed in a Wisconsin state court to collect the fine.

I

The Board contends that neither Schulist nor the Company learned of the result of the Union trial until the state court action was started and that, since the August 1973 unfair labor practice charge was filed within six months from the date the civil suit was filed, the charge was not barred by time.

Although Schulist was not given formal notice that a fine had been levied until he received a summons in a civil suit, he was fully aware that a fine was a possibility. He made no inquiry about the result of the trial even though he was aware that similar fines had been levied in reference to the same labor dispute. Under these circumstances, it was his obligation to find out the result of the trial if the result later was to be the basis of a charge lodged with the Board by the Company. In my opinion he had constructive knowledge of the fact that a fine had been levied. (In this situation Schulist's failure to inquire was binding on the Company.) There was no obligation under the circumstances on the part of the Union to notify Schulist that a fine had been levied against him. Yet, the Board's stress of the fact that Schulist received no notice of the fine seems to imply that the Union did have such an obligation and that its failure to give prompt notice tolled the

statute. It is significant that there is no evidence of any concealment of the fact that a fine had been levied or that knowledge of the fine had deliberately been kept from Schulist.

## II

The Union contends and the Board agrees that its suit to collect the fine cannot be an independent violation of section 8(b)(1)(B) when the fine was levied more than six months prior to the filing of the unfair labor practice charge. In support of its contention it cites the Supreme Court's decision in *Local Lodge No. 1424, Int'l Assoc. of Machinists, AFL–CIO v. NLRB,* 362 U.S. 411, 80 S.Ct. 822, 4 L.Ed.2d 832 (1960).

In an attempt to avoid the impact of that decision the Board in its brief says:

> The Union's reliance upon *Local Lodge No. 1424, I.A.M. v. N.L.R.B., (Bryan Mfg.),* 362 U.S. 411, 80 S.Ct. 822, 4 L.Ed.2d 832 (1960) in support of its Section 10(b) contention is misplaced for that case is clearly distinguishable from the situation presented here. *Bryan* holds that an action within the Section 10(b) period will not be adjudged an unfair labor practice if the action can be termed unlawful only through reference to events occurring outside the Section 10(b) period. *Bryan* might be relevant to the instant case if the Board had found the September 1972 fine to be outside the Section 10(b) period but had nonetheless found the June 1973 lawsuit to be an unfair labor practice through reference to the September 1972 fine. The Board however, found that the September 1972 fine was itself within the Section 10(b) period because Schulist did not learn the fine until June 1973.

Although the Board disclaims the suit to collect the fine was an independent violation of section 8(b)(1)(B), its disclaimer is contrary to the Board's Supplemental Decision and Order. The decision reads in part:

> On June 7, 1974, the National Labor Relations Board issued a Decision and Order in the above-entitled proceeding in which the Board adopted the findings and conclusions of the Administrative Law Judge. . . . In his Decision, the Administrative Law Judge concluded, *inter alia,* that Respondent violated Section 8(b)(1)(B) of the Act by fining Supervisor Schulist for failing to comply with its "no contract-no work" order, and *by thereafter instituting action against Schulist in an attempt to collect the fine.* (emphasis added.)

Moreover the use of the commencement of the civil suit as the start of the six month period necessarily means that the Board adopts the theory that a civil suit to collect a disciplinary fine is an independent violation of section 8(b)(1)(B).

*Machinist Local* is apposite and controls the disposition of this proceeding. In that case a collective bargaining contract containing a "union security" clause had been entered into at a time when the union represented less than a majority of the employees. Since, under the circumstances, the security clause was illegal, complaints of unfair labor practices were filed with the Board against the company and the union. The Supreme Court held that the complaints were time barred because the complaints, although charging continuing enforcement of the illegal clause, were not filed within six months of the date of the agreement. In the course of his opinion Mr. Justice Harlan, speaking for the court, wrote:

> In any real sense, then, the complaints in this case are "based upon" the unlawful execution of the agreement, for its enforcement, though continuing, is a continuing *violation* solely by reason of circumstances existing only at the date of execution. To justify reliance on those circumstances on the ground that the maintenance in effect of the agreement is a continuing violation is to support a lifting of the limitations bar by a characterization which becomes apt only when that bar has already been lifted. Put another way, if the § 10(b) proviso is to be given

effect, the enforcement, as distinguished from the execution, of such an agreement as this constitutes a *suable* unfair labor practice only for six months following the making of the agreement.

In the proceeding before us the charge "in any real sense" was based on the fine. The suit for its collection was "manifestly not independent of the legality of [the fine]," 362 U.S. at 423, 80 S.Ct. at 830, 4 L.Ed.2d at 841. The suit vis-a-vis an action to collect a sum due and owing was benign.

A holding that a civil suit to collect a disciplinary fine levied by a union can be deemed to be an independent violation of section 8(b)(1)(B) without reference to when the fine was levied, would permit a charge similar to the one here to be filed within six months of the time the civil action was started so long as it was filed within a state statute of limitations. Such a holding would defeat the very purpose of section 10(b) of the Act—to provide for a speedy resolution of labor-management disputes. Reference to the applicable Wisconsin statutes furnishes some idea of its likely impact: section 893.19(3), Wisconsin Statutes, provides for a six year statute of limitations in contract actions and section 893.16(2), Wisconsin Statutes, provides for a twenty year statute of limitations in cases involving a sealed instrument. Regardless of whether the six year or twenty year provisions would apply in the instant situation the salutary purposes of section 10(b) would be completely emasculated.

I would deny enforcement.