**BALTIMORE REBUILDERS,
INC., Petitioner,**

v.

**The NATIONAL LABOR RELATIONS
BOARD, Respondent.**

**No. 78–1369.**

United States Court of Appeals,
Fourth Circuit.

Argued May 9, 1979.

Decided Dec. 28, 1979.

---

Leonard E. Cohen, Baltimore, Md. (Sandra M. Gilmore, Frank, Bernstein, Conaway & Goldman, Baltimore, Md., on brief), for petitioner.

Christine Weiner Peterson, N. L. R. B., Washington, D. C. (John S. Irving, Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Robert E. Allen, Acting Associate Gen. Counsel, Elliott Moore, Deputy Associate Gen. Counsel, Marjorie S. Gofreed, N. L. R. B., Washington, D. C., on brief), for respondent.

Denis F. Gordon, Washington, D. C. (Virginia A. McArthur, Washington, D. C., on brief), for intervenors.

Before FIELD, Senior Circuit Judge, and WIDENER and HALL, Circuit Judges.

K. K. HALL, Circuit Judge,

Baltimore Rebuilders, Inc. ("Rebuilders") petitions to have set aside an order of the National Labor Relations Board (the "Board") dismissing a complaint issued against the International Association of Machinists and Aerospace Workers, AFL-CIO (the "Union") and its pension fund, the I.A.M. National Pension Fund (the "Fund"). 235 N.L.R.B. No. 209 (1978). The complaint alleges that the maintenance and enforcement of certain pension plan provisions have unlawfully coerced and restrained Rebuilders' employees in the exercise of the right to vote to decertify the Union as their collective bargaining representative. Section 8(b)(1)(A) and (b)(2) of the National Labor Relations Act (the "Act"), 29 U.S.C.A. § 158(b)(1)(A) and (b)(2).

We think the complaint was properly dismissed because there is no evidence of an intention to violate the Act—appearing on the record before the Board or from the provisions themselves. The cancellation provisions, on their face and as here applied, are not discriminatory or coercive. Their impact on employee voting rights is indirect and they serve a legitimate business purpose of the Fund. Accordingly, we deny Rebuilders' petition.

## I. UNION PENSION PLAN

### A. The Pension Fund

The Fund was created in 1960 to provide retirement benefits to employees who are represented by the Union's locals. There are approximately 2000 employers making contributions for 90,000 union-represented employees. The Fund is not administered by the Union.[1] It is controlled by an independent board of trustees whose membership is made up of an equal number of union and employer representatives.[2] Pension policy is set by this board and it is generally subject to federal statutory regulation.[3]

### B. Work Time Credits: Earned and Unearned

At issue is the plan's scheme for work time credits which each employee must accumulate for entitlement to pension benefits. The plan allows full-scale pension benefits to covered employees on the basis of their total years of service without regard to when their employer began making contributions to the Fund. Once commenced, pension benefits are paid whether or not the pensioner's former employer continues to make contributions.[4] This scheme poses

[1] At the outset, we note the Fund has vigorously objected before the Board and on appeal to any holding that presumes the Fund to be an agent of the Union. Because we hold the pension plan provisions at issue do not violate the Act in any event, we reserve decision about whether pension policies generally fall within the strictures of the Act.

[2] The Labor Management Relations Act, Section 302, prohibits payments from employers to employee representatives except under enumerated exceptions, one of which is for pension payments made by written agreement to trust funds which must be administered with equal representation of employers and employees. Section 302(c)(5), 29 U.S.C.A. § 186(c)(5).

[3] See Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C.A. § 1001 et seq.

[4] If an employer's contributions for the unit as a whole are for less than four years, pension benefits may be reduced. Art. IX, §§ 3 and 4d; See Note 10, infra.

a generous unfunded benefit to employees who retire soon after the employer begins contributions for their unit, and it poses a significant liability to the Fund if for any reason the employer's expected "stream of contributions" ceases.

Two kinds of work credits may be applied toward a pension entitlement. "Past Service Credits"[5] are granted on a unit-wide basis when an employer makes its first contribution to the Fund. The number of these credits, which are accrued by each employee on that date, equals his months of previous employment with the employer. When contributions cease, these credits are cancelled. "Future Service Credits"[6] are earned for each month the employee works after that date so long as the employer continues making contributions for the unit.

The Administrative Law Judge hearing the complaint found that this scheme of earned and unearned credits allowed older, long service employees to receive full pension benefits, although their employer's payments over the years remaining before they retired could not be expected to pay for the Fund's liability for their pensions. For example, it was found that a twenty-five year employee could earn a full pension although his employer had joined the plan only one year before he retired—by adding one year of Future Service Credits to his twenty-four years of Past Service Credits.[7]

The liability to the Fund represented by these unearned credits is greatest when the employer commences coverage and diminishes as contributions continue since all credits accruing after the initial contribution date are earned Future Service Credits.

### C. Employer Participation/Unit-Wide Cancellation of Unearned Credits

The employer's participation in the plan continues only so long as its employees continue to bargain through a local to include a pension contribution clause in their collective bargaining agreement.[8] The contribution clause obligates the employer to make unit contributions, at an agreed rate, as part of the benefits package which will be effective during the term of the contract. The agreed rates of contribution may change from contract to contract, with the level of benefits payable upon retirement generally set by the highest rate of contribution—not the most recent rate.[9]

The cancellation provisions[10] provide that when an employer's participation in the

5.  Art. III.

6.  Art. IV.

7.  Art. IV, §§ 1, 4 and 5.

8.  See 29 U.S.C.A. § 1002(37)(A)(ii).

9.  Art. V, § 3(a) and (c).

10.  Art. IX: TERMINATION OF PARTICIPATION

Section 1.  General

The financing of the benefits provided by the Plan is based on the continued contributions from Contributing Employers, as required in the Collective Bargaining Agreements. If a Contributing Employer should fail to make the required contributions, the Pension Plan cannot be continued for the employees of such employer.

In addition, if a Lodge [local] and an employer should enter into a Collective Bargaining Agreement requiring contributions to the Fund, and one or more employees of such Contributing Employer should then retire under the provisions of the Plan, the obligation to contribute to the Plan should continue in effect for a sufficient period of time to enable the Plan to operate on an actuarially sound basis. The purpose of this Article is to set forth the basis for terminating the participation in the Plan of Contributing Employers who are delinquent in their contributions to the Plan, and the basis for termination of Credited Service and pension benefits for employees of delinquent employers. In addition, this Article contains the basis for the Trustees to impose penalties by way of denial of pension benefits and Credited Service for employees of employers who, under certain circumstances, do not continue to be obligated to contribute to the Fund in accordance with their Collective Bargaining Agreement with the Lodge [local].

Section 2.  Causes of Termination

The participation of a Contributing Employer shall terminate:

a.  When the employer is no longer obligated by a Collective Bargaining Agreement to make contributions to the Fund on the basis required by the Trustees; or

b.  When the Employer fails to pay an amount due the Fund, and termination is deemed appropriate by the Trustees; or

c.  When the employer fails to comply with administrative procedures adopted by the Trus-

Fund terminates (and its contributions necessarily cease), all Past Service Credits are cancelled for active employees.[11] On the date contributions cease these provisions take away the same benefit that was granted on the date contributions began.

Cancellation is effective on a unit-wide basis and is automatic. No discretion is allowed to the Fund to prevent cancellation for any employee or unit. Active employees are affected regardless of union affiliation or activity. All units suffer the same consequence, whether or not they continue to be represented by a Union local. One exception exists for units when the employer drops out of the Fund and does not continue operating his present or a related business. Employees of such discontinued units are excepted from cancellation.[12]

Once cancelled, working employees may reactivate their credits by changing employment: if the employee terminates within 30 days of the employer's termination of unit coverage or if they work under covered status in five of the next eight years.[13]

---

tees and termination is deemed appropriate by the Trustees.

Section 3. Short Term Contributing Employers

If within 48 months of its Contribution Date the participation of a Contributing Employer terminates and that employer goes out of business, or within 48 months of its Contribution Date the number of Covered Employees employed by the Contributing Employer at any time is less than 50 percent of the original number employed on the Contribution Date of the Contributing Employer, then the following actuarial limitations shall apply:

a. Pensioners who formerly were employed by the Contributing Employer shall have their pensions terminated or reduced, if the total amount contributed by the said Contributing Employer, less benefit payments already made, is less than the actuarially determined value of the pension benefits thereafter payable with respect to such Pensioners; and

b. Covered Employees employed at any time by the Contributing Employer shall have their benefits terminated or altered in such manner as the Trustees consider necessary to preserve an actuarially sound relationship between the liability for benefits anticipated for the said Covered Employees involved and the contributions of the said Contributing Employer, after taking into account the existing liability to Pensioners who formerly were employed by the Contributing Employer.

This Section shall not apply to any Covered Employee who has at least five years of Future Service credit before a break in Covered Employment occurs under Section 3 of Article IV.

Section 4. Withdrawal by Active Employers

a. If the participation of a Contributing Employer terminates and should that employer, or its successor, thereafter continue in the same or related business, then all credited Service based upon employment with such employer shall be cancelled retroactively, notwithstanding any contrary provision of this Plan.

b. Credited Service shall not be cancelled for the following persons:

(1) Covered Employees whose employment with such employer had ended at least 24 months before the participation of the Contributing Employer terminates; or

(2) Covered Employees whose employment with such employer ends within thirty (30) days of the employer's termination; or

(3) Covered Employees in a bargaining unit which is transferred to the jurisdiction of another I.A.M. Lodge [local], provided that:

i) No member of that Lodge [local] is a Covered Employee under this Plan; and

ii) The employee's rights under this Plan are vested under Article IV, Section 4; and

iii) Pension benefits under this Plan are not duplicated under another pension plan.

c. Covered Employees shall have their Credited Service reinstated if they earn at least five years of Future Service credit at any time within the eight (8) year period following the date the participation of the Contributing Employer terminates.

d. Pensioners shall not lose their Credited Service if their benefits were effective before the participation of the employer terminates; provided, however, that if the participation of the employer terminates within 48 months of its Contribution Date, then all pensions based upon Credited Service with that employer shall be ended or reduced if the total amount contributed, less benefit payments already made, is less than the actuarially determined value of the pension benefits thereafter payable with respect to such Pensioners.

11. Pensioners are excepted from cancellation. Art. IX, § 4d. See Notes 4 and 10, *supra*.

12. Art. IX, § 4a. See Note 10, *supra*.

13. Also, the plan allows other limited individual employee exceptions to the unit-wide cancellation rule. They apply to employees who already have changed employment at least 24 months before unit coverage ends, art. IX § 4b(1), and to those whose unit is transferred to a different Union local where no other "Covered Employee" of the plan is a member and the transferee's rights are vested (by his having at least attained age 50 and earned ten years

Also, if the employer recommences participation in the Fund within a few years, the cancelled credits could be automatically reactivated for the unit.[14]

## II. CANCELLATION OF UNEARNED CREDITS FOR REBUILDERS' UNIT

Rebuilders is engaged in the manufacture and wholesale distribution of rebuilt carburetors in Baltimore, Maryland. In late 1969, the Union's local, Lodge # 199, District # 12, was certified by the Board as the collective bargaining representative of Rebuilders' production and maintenance employees. Several months later a three-year collective bargaining agreement was executed obligating Rebuilders to commence contributions in the last year of the contract. Contributions were made for that year and a second three-year contract was entered into requiring the contributions to continue during its term. When this contract expired, Rebuilders and the local failed to reach a third agreement. A strike ensued, and three months later the local lost a decertification election, making renewal of the pension contribution clause an impossibility.

Four months after the election, the Fund administrator sent to Rebuilders and its employees letters[15] officially notifying them that the effect of the decertification vote was to terminate Rebuilders' participation in the plan causing referenced provisions of the plan to apply, including the cancellation provisions at issue. The effective date of cancellation was first stated to be the date the last contribution was received by the Fund but a second letter on the same form corrected this error, stating that the effective date was the expiration date of the collective bargaining agreement.

## III. DISCUSSION

A difficult issue is presented because we are asked to review a complex union-sponsored pension plan which serves the purpose of pension plans generally (and unions specifically) to provide generous benefits to employees, in the context of the Act's prohibitions against penalizing employees in the free exercise of organizational rights.[16] No issue of discriminatory representation is present. The substance of Rebuilders' charge is that, in the context of a decertification election, the structure of the pension plan and its automatic cancellation rules effectively overwhelm and dictate the col-

credited service, of which 5 years must be for Future Service Credits), art. IV, § 4b. See note 10, *supra*.

14. Art. IX, § 4c. See Note 10, *supra*.

15. The letter form, dated August 24, 1976, is captioned, "Termination of Participation, Article IX, Section 4" and reads, in pertinent part,

We have been advised that the I.A.M. bargaining unit employees of Baltimore Rebuilders, Inc. have decertified I.A.M. District Lodge No. 12 as their bargaining agent. The effect of this is to terminate participation and pension coverage for the Covered Employees of Baltimore Rebuilders, Inc. The effective date of termination is January 29, 1976, the expiration date of the last collective bargaining agreement. Under Article IX, Section 4 of the Rules and Regulations of the I.A.M. National Pension Fund, Benefit Plan A the following shall apply:

1. For Covered Employees of Baltimore Rebuilders, Inc. all Past Service Credit based on employment with the employer shall be cancelled retroactively notwithstanding any contrary provision of the Plan.

2. Past Service shall not be cancelled for any Covered Employee whose employment with such employer terminates within 30 days of the employer's termination (by February 29, 1976), OR if the Covered Employee terminated his employment 24 months prior to the company's termination of participation date.

3. Covered Employees shall have their Past Service Credit reinstated if they earn at least five (5) years of Future Service Credit at any time within the eight (8) year period following the Termination of Participation.

16. The Fund's work credit cancellation provisions have been reviewed by another circuit court in the context of a law suit against the Fund for arbitrary denial of pension benefits. *Norton v. I.A.M. Nat. Pension Fund,* 180 U.S. App.D.C. 176, 182, 553 F.2d 1352, 1358, N.8 (D.C.Cir. 1977). The issue here, on review of an alleged violation of the Act, was not considered by that court and the facts regarding the Fund's need to cancel unpaid credits were presumed true for the decision in that case.

lective choice of unit employees to elect continued representation by the Union's locals.

The Act is intended to insulate employees' rights to employment from the exercise of their organizational rights, *Radio Officers' Union v. NLRB*, 347 U.S. 17, 40, 74 S.Ct. 323, 98 L.Ed. 455 (1954), and to assure that when union membership or unit representation is elected it is done so by a process of free choice. Illegal are actions calculated to inhibit that process. However, the mere creation of a benefit so valuable that predictably it will be elected by a free and rational choice does not violate the Act.

It has long been recognized that an employer can make reasonable business decisions, unmotivated by an intent to discourage union membership or protected concerted activities, although the foreseeable effect of these decisions may be to discourage what the act protects. For example, an employer may discharge an employee because he is not performing his work adequately, whether or not the employee happens to be a union organizer. See *National Labor Relations Board v. Universal Camera Corp.*, 2 Cir., 190 F.2d 429. Yet a court could hardly reverse a Board finding that such firing would foreseeably tend to discourage union activity. Again, an employer can properly make the existence or amount of a year-end bonus depend upon the productivity of a unit of the plant, although this will foreseeably tend to discourage the protected activity of striking. *Pittsburgh-Des Moines Steel Co. v. National Labor Relations Board*, 9 Cir., 284 F.2d 74. A union, too, is privileged to make decisions which are reasonably calculated to further the welfare of all the employees it represents, nonunion as well as union, even though a foreseeable result of the decision may be to encourage union membership.

*Local 357, Teamsters v. NLRB*, 365 U.S. 667, 679–80, 81 S.Ct. 835, 841–842, 6 L.Ed.2d 11 (1961) (Mr. Justice Harlan concurring).

To determine whether conduct falls within the statutory ban, "[i]t is the 'true purpose' or 'real motive' . . . that constitutes the test." *Local 357, Teamsters v. NLRB*, 365 U.S. at 675, 81 S.Ct. 835, quoting from *Radio Officers' Union v. NLRB*, 347 U.S. at 43, 74 S.Ct. 323. Proof of subjective motive can, in limited situations, be made out from the conduct itself, *NLRB v. Erie Resistor Corp.*, 373 U.S. 221, 227–28, 83 S.Ct. 1139, 10 L.Ed.2d 308 (1963); however where the impact on protected rights is slight or indirect, or where it may be explained by reference to other lawful considerations, " '[it] is prima facie lawful,' and an affirmative showing of improper motivation must be made." *NLRB v. Great Dane Trailers, Inc.*, 388 U.S. 26, 34, 87 S.Ct. 1792, 1798, 18 L.Ed.2d 1027 (1967).

Here, the Board's hearing developed no evidence of an intention to violate the Act. The Fund administrator testified that the intent of the cancellation provisions was to increase the incentive for employees covered by the Fund to prevent, whenever possible, withdrawal from the Fund by active employers. (App. Ex. 62; Tr. 168–70). In regard to the Fund's enforcement of the provisions, the letters notifying employees of cancellation, were found by the Administrative Law Judge to be only informational. Their tone was not threatening. We note that since the letters were mailed well after the election, there can be no contention that the timing of their receipt by employees was coercive.

Only the plan's terms are left for scrutiny. On their face they evidence no impermissible intent. They are not discriminatory or coercive. *Rosen v. NLRB*, 455 F.2d 615 (3rd Cir. 1972); *Local No. 167, Progressive Mine Workers v. NLRB*, 422 F.2d 538 (7th Cir.), *cert. denied* 399 U.S. 905, 90 S.Ct. 2198, 26 L.Ed.2d 560 (1970). They operate evenly against all unit employees regardless of their personal preference to keep or dismiss the union. They operate automatically when the possibility of continuing contributions is lost.

Union-sponsored pension plans are well-established as important services which unions should provide to employees as part of the benefits they bring to the process of employee representation and collective bargaining. Congress has expressly recognized that such pension plans can pay pensions based on a scheme of earned and unearned work credits. 29 U.S.C.A. § 1002(37)(A). When a union is vying for certification, the scheme has the same impact on organizational rights as when the union seeks to prevent decertification. It poses a significant inducement to older loyal employees to vote for the union in order to obtain the union's pension coverage. But, the scheme also advances the liberal social purposes of any pension plan both to encourage its adoption on a broad financial base and to pay early, full-scale benefits to all employees as they retire—not just to those who will retire after contributions can pay for the liability of their pensions.

■ What Congress authorizes we cannot outlaw. It has authorized just such a scheme and we do not think a reasonable limitation on the unfunded liability represented by it can violate the Act. *See* 29 U.S.C.A. § 1001(b). The reasonableness of the limitation here is shown by the fact that credits are cancelled automatically when contributions end.

By the requirement that unit contributions be part of the benefits package negotiated in the collective bargaining agreement, the plan allows several events to announce the end of unit contributions—only one of which is decertification of a local. For example, local and employer may agree to join another pension plan (which might offer the same inducement to join which is here cancelled), or they may agree to eliminate pension benefits from their contract in favor of higher wages or other more immediate benefits. The economic and social conditions playing upon such negotiations are as varied as they are unpredictable. But, in those cases, cancellation is effective and the local continues to represent the unit.

We must note that because coverage is voluntary and is tied to the term and negotiation of each contract, if employees are willing to trade away pension benefits, the cancellation provisions effectively "penalize" the Union representatives, not the employer.

In the context of a decertification vote, the impact of cancellation is only one factor to be considered by employees and may have little impact on the election. If a second union vies to represent the unit, its pension fund may offer credits similar to those subject to cancellation. Only voting employees who were working on the initial contribution date have accrued any credits which can be cancelled. Each year of contributions reduces the ratio of unearned to earned credits for such employees, as well as for the unit as a whole. Consequently, the longer the contributions have continued, lesser is the impact of cancellation. Again, cancellation is only one of many factors involved in the collective decision to decertify. Contrary to Rebuilders' assertion, cancellation cannot dictate the outcome of that vote, nor can it overwhelm or intimidate an individual employee in the free exercise of his right to vote for or against the local's representation.

■ We think the challenged provisions evidence an intention to encourage the voluntary continuation of pension coverage on a unit-wide basis. As such, they serve a legitimate business purpose of the Fund to reasonably limit an unfunded liability. Any effect cancellation may have on protected employee rights is consequential, flowing from the nature of the pension plan to provide voluntary and generous benefits from contract term to contract term.

The exceptions to cancellation when unit contributions end support this conclusion. When an employer quits his business, all employees lose their jobs and no voluntary decision remains. If the employer changes business operations, the nature of the bargaining unit changes, employees may lose or change jobs, and the attractiveness of voluntary pension coverage wanes until stability in the unit is restored. In such cases,

inducements to continue contributions are likely to be unavailing and cancellation in fact would take on the nature of a "penalty" to those employees.

Likewise, when individual employees change employment, the possibility of cancellation of their credits cannot effect a decision to continue unit coverage. Rebuilders contends that the exceptions for individual employees raise the specter of rewarding "union faithful" who leave a shop, especially within 30 days of decertification. But we note that, as in Rebuilders' shop, when the decertification vote is beyond 30 days from the end of contributions (the contract term), any pro-union employee who may leave will suffer cancellation along with the "employer faithful," because his termination must be within 30 days of the end of contributions—rather than the date of the decertification vote.

In all, we think automatic cancellation of the credits when contributions cease is a reasonable pension plan provision which operates fairly to induce the voluntary continuation of pension coverage. As where a union's activities and the quality of its services attract employees to membership, we think the very existence of a union-sponsored pension plan encourages union representation.

The very existence of the union has the same influence. When a union engages in collective bargaining and obtains increased wages and improved working conditions, its prestige doubtless rises and, one may assume, more workers are drawn to it. When a union negotiates collective bargaining agreements that include arbitration clauses and supervises the functioning of those provisions so as to get equitable adjustments of grievances, union membership may also be encouraged. The truth is that the union is a service agency that probably encourages membership whenever it does its job well.

*Local 357, Teamsters v. NLRB*, 365 U.S. at 675–76, 81 S.Ct. at 839–840.

Accordingly, the petition to review the Board's order is denied.

PETITION DENIED.