## AMERICAN BROADCASTING COMPANIES, INC., ET AL. *v.* WRITERS GUILD OF AMERICA, WEST, INC., ET AL.

No. 76–1121.  Argued December 5, 1977—Reargued March 20, 1978—
Decided June 21, 1978*

---

*Together with No. 76–1153, *Association of Motion Picture & Television Producers, Inc.* v. *Writers Guild of America, West, Inc., et al.;* and No. 76–1162, *National Labor Relations Board* v. *Writers Guild of America, West, Inc., et al.,* also on certiorari to the same court.

412

WHITE, J., delivered the opinion of the Court, in which BURGER, C. J., and BLACKMUN, POWELL, and REHNQUIST, JJ., joined. STEWART, J., filed a dissenting opinion, in which BRENNAN, MARSHALL, and STEVENS, JJ., joined, *post*, p. 438.

*Norton J. Come* reargued the cause for petitioner in No. 76–1162. With him on the briefs were *Solicitor General McCree, John S. Irving, Carl L. Taylor,* and *John G. Elligers. Harry J. Keaton* reargued the cause and filed a brief for petitioner in No. 76–1153. *Charles G. Bakaly* reargued the cause for petitioners in No. 76–1121. With him on the briefs was *Gordon E. Krischer.*

*Julius Reich* reargued the cause for respondent Writers Guild of America, West, Inc., in all cases. With him on the briefs was *Paul P. Selvin.*

*Laurence Gold* reargued the cause for the American Federation of Labor and Congress of Industrial Organizations as *amicus curiae* urging affirmance. With him on the brief was *J. Albert Woll.*

MR. JUSTICE WHITE delivered the opinion of the Court.

The issue in this litigation is whether a labor union commits an unfair labor practice when it disciplines a member who is a supervisory employee for crossing the union's picket line during a strike and performing his regular supervisory duties, which include the adjustment of grievances.

## I

Respondent Writers Guild of America, West, Inc. (hereafter respondent), represents persons hired to perform writing functions for employers engaged in the production of motion pictures and television films, and in 1973 had contracts with certain petitioners that were about to expire. Petitioner in No. 76–1153 is the Association of Motion Picture and Television Producers, Inc., whose members are engaged in the production of motion pictures and television films. Petitioner

represents its members in the negotiation and administration of collective-bargaining contracts. The three television networks, NBC, CBS, and ABC, petitioners in No. 76–1121, are also engaged in the production of television films and negotiate and administer collective-bargaining contracts. In March 1973, respondent engaged in a strike against both of these groups of petitioners, picketed the various premises, and issued strike rules that it enforced against its own members. It is this action which gave rise to this case.

Among respondent's members are a substantial number of persons who were engaged by petitioners primarily to perform executive and supervisory functions including the selection and direction of writers and including certain limited writing duties. These persons are referred to as "hyphenates" and include various categories of producers, directors, and story editors.[1] Although the primary function of hyphenates is not to write, they do perform minor writing tasks (referred to in the contract as "A to H" functions) that are an integral part of their primary duties and that expressly are not covered by the contracts between petitioners and respondent.[2]

---

[1] Executive producers, with the help of producers and associate producers, have the primary responsibility for the production of films for motion pictures or for television. The responsibility begins with the idea or concept for the film or the series and carries through to the post-production stages after filming. Directors are in personal charge of the principal photography of the film. They are responsible for the employment of crew and actors and effectively direct such employees. Story editors, story consultants, script consultants, executive story editors, and executive story consultants principally assist the producer in the highly important function of dealing with scripts and writers. They have individual judgment, initiative, and responsibility, and their tasks are clearly supervisory. Approximately 80 hyphenate members of respondent were principally employed as producers of one kind or another, approximately 15 were directors, and another 15 were in the story editor category.

[2] The finding of the Administrative Law Judge in this regard was:

"The important point is that when these executives and supervisors perform those functions excluded from the Respondent's bargaining agree-

Only in the event hyphenates are assigned or employed by petitioners to perform additional writing services are the rates for such services governed by the collective-bargaining contracts with respondent. In connection with the performance of their regular, primary duties, which, with the limited exception noted, do not include writing services, many, but not all, hyphenates are represented by labor organizations other than respondent. Some of the contracts between these other organizations and petitioners contained no-strike clauses when the events involved herein occurred. Certain hyphenates were pressured by these other labor organizations to honor these no-strike pledges by reporting to work.

Respondent, meanwhile, was preparing its own kinds of pressure to keep the hyphenates from working. In preparation for the strike, respondent issued and distributed to its members, including the hyphenates, some 31 strike rules. The rules, among other things, forbade any act prejudicial to the welfare of respondent such as conduct tending to defeat a strike or to weaken its effectiveness (Rule 1); prohibited all members "from crossing a picket line which is established by the Guild at any entrance" of a struck premises (Rule 12); forbade the entry of any struck premises for certain purposes and required notice to respondent when entry was made for other purposes (Rule 13); [3] and obliged members to accept picket duty when assigned by respondent (Rule 28). Another

---

ments they thereby perform functions which the parties have acknowledged do not constitute work reserved to Respondent's non-hyphenate members under the agreements, but rather are accepted as a normal part of the duties and responsibilities of the executives and supervisors (as hereinabove discussed) employed by the employers involved." (Footnote omitted.) App. to Pet. for Cert. in No. 76–1162, p. 35a.

The contract provided that performance of any "A to H" writing "shall not constitute such person a writer hereunder." *Id.*, at 33a.

[3] Rule 13 provided:

"Members are prohibited from entering the premises of any struck producer for the purpose of discussion of the sale of material or contract of

rule (Rule 30), rescinded midway in the strike, provided that no member could work with any individual, including the writer-executive, who had violated union strike rules.[4] The strike rules' applicability to hyphenates was made clear in Rule 24: "All members, regardless of the capacity in which they are working, are bound by all strike rules and regulations in the same manner and to the same extent as members who confine their efforts to writing." The rules were widely publicized, and respondent repeatedly emphasized, orally and in writing, that it would enforce the rules against hyphenates. Nor could a hyphenate escape those strictures by resigning, for it was respondent's policy, once the strike was under way,

---

employment, regardless of the time it is to take effect. Members are also prohibited from entering the premises of any struck producer for the purpose of viewing any film. . . . [S]hould a member find it necessary to visit the premises of a struck producer for any reason apart from the foregoing he should inform the Guild in advance of the nature of such prospective visit." *Id.*, at 36a–37a.

[4] Rule 30 provided:

"No member shall work with any individual, including a writer-executive who has been suspended from Guild membership by reason of his violation of strike rules, or has been found by the Council to have violated strike rules, in the event no disciplinary action was instituted against such person." *Id.*, at 38a.

After the issuance of the initial complaint in this case, Rule 30 was rescinded by respondent in a letter to all of its members, which stated, among other things, that "because the old rule could be misconstrued to mean that the Guild was maintaining an improper sanction, a matter of anathema to this Guild, the Board of Directors rescinded old Rule 30 . . . ." The assessment of the Administrative Law Judge was:

"In particular, by threatening to blacklist in perpetuity such hyphenates who worked during the strike, the rules threatened to drive these hyphenates out of the industry. Though the mandatory effect of the rule was rescinded . . . there are other indications that Respondent's actions encourage a voluntary blacklist. . . . [T]he fact is that Respondent did suggest it, and it is now impossible to disentangle the consequences flowing from its actions." *Id.*, at 69a–70a.

not to permit withdrawal from the union, then or for six months following the completion of negotiations.

Petitioners, however, informed the hyphenates that petitioners' operations were continuing and that the hyphenates were expected to report for work and perform their regular supervisory functions. Petitioners were careful to assure that hyphenates would not be requested to perform writing duties covered by the union contract.

Some hyphenates went to work, informing their employers, as respondent knew, that they would perform only their primary duties as producer, director, or story editor. Others refrained from reporting for work. Between April 6 and November 8, 1973, respondent notified more than 30 hyphenates who returned to work that they had been charged with violating one or more of the strike rules. Most often, the charges related to Rules 1, 12, and 13.[5] Various disciplinary trials ensued. In these proceedings, the evidence was that the hyphenates who returned to duty performed only the normal functions of the supervisory positions for which they were employed. There was no proof that hyphenates performed any work covered by the recently terminated contracts between petitioners and respondent. As the Administrative Law Judge observed, respondent "for the most part professed little or no interest in what kind of work was done during the strike"

---

[5] The Administrative Law Judge found that a typical notice of charges against a hyphenate contained the following:

"Specifically, you are charged with: (1) having crossed the Guild's picket lines . . . during the months of March, April, May and June 1973, without having informed the Guild in advance of the nature of your business with said company and without having obtained a Guild pass to enter said premises; (2) having during the months of March, April, May and June 1973, rendered services for . . . a company against whom the Guild was at such times on strike; and (3) refusing to perform picket duties during the strike after having been requested to do so by representatives of the Guild." *Id.*, at 45a. (Footnote omitted.)

by the hyphenates who chose to work.[6]   Between June 25 and September 28, 1973, various penalties were imposed by respondent as the result of these disciplinary proceedings.   The penalties included expulsions, suspensions, and quite substantial fines.[7]

Meanwhile, the Association and network petitioners had filed unfair labor practice charges, and the General Counsel of the National Labor Relations Board had issued complaints against respondent charging violations of § 8 (b)(1)(B) of the National Labor Relations Act, 61 Stat. 141, 29 U. S. C. § 158 (b)(1)(B), which provides that "[i]t shall be an unfair labor practice for a labor organization . . . to restrain or coerce . . . an employer in the selection of his representatives for the purposes of collective bargaining or the adjustment of grievances."   Extensive hearings followed, the Administra-

---

[6] *Id.,* at 43a–44a.  Respondent, through counsel, took the position at the disciplinary hearings that the hyphenates charged were subject to discipline simply for crossing respondent's picket line, whether or not they crossed for the purpose of performing bargaining services for a struck employer.  Respondent held that charges would properly lie even against hyphenates who had given assurances not to perform any writing services for a struck employer.

[7] The Administrative Law Judge noted the penalties against 10 of the hyphenates charged and tried:

"Two were expelled from membership and fined $50,000 each; one was expelled from membership and fined $10,000; one was suspended from membership for 2 years and fined $10,000; one was suspended for 2 years and fined $7,500; one was suspended for 3 years and fined $5,000; one was expelled from membership and fined $2,000; one was expelled and fined $100; and one was suspended for 2 years and fined $100.  These penalties received wide publicity in the local press and trade papers.  The appeals of nine of these men has [*sic*] been voted upon by Respondent's membership at a special meeting and the penalties were drastically reduced.  Apparently all remaining actions with respect to discipline of hyphenate-members for working during the strike are now being held in abeyance pending resolution of these cases."   *Id.,* at 46a.

tive Law Judge ultimately recommending that the charges be sustained and making findings and conclusions that were adopted by the National Labor Relations Board.

These findings included an analysis of the primary functions for which the hyphenates were employed. It was concluded that all of the producers, directors, and story editors involved were employed to perform supervisory functions and were supervisors within the meaning of § 2 (11) of the Act, 29 U. S. C. § 152 (11). It was also found that the hyphenates in each of these categories regularly had the authority and the task of adjusting grievances.[8] "It is clear, as has

---

[8] The Administrative Law Judge found:

"The producer has substantial responsibility and authority in adjusting grievances between directors and craft employees, directors and actors and actresses, between two or more actors or actresses, and in other similar situations. Producers also have responsibility and authority to adjust grievances involving writers, as in the case of disputes between writers and story editors." *Id.*, at 26a.

Executive producers supervise one or more producers, and associate producers assist the producer.

"Without distinguishing among them in detail, it is clear on this record that persons occupying these positions in the motion picture or television industries have the authority to hire, terminate, and responsibly direct other employees, and to adjust employee grievances, or to effectively recommend such action, and are thus supervisors within the meaning of Section 2 (11) of the Act." *Id.*, at 27a.

With respect to directors, the Administrative Law Judge determined that they

"hire or effectively recommend the employment of crew and actors, effectively direct such employees, and may discharge or effectively recommend the discharge of employees. They have authority to and do adjust grievances of such employees. It is found that persons performing the functions of director in the television and motion picture industries are supervisors and adjust grievances of employees within the meaning of the Act." *Id.*, at 28a.

Story editors supervise writers in the development of ideas and the preparation of scripts. They interview and recommend the hiring of new

been found, that the normal performance of the hyphenates' primary functions involves the adjustment of employee grievances, and, in the case of producers on distant location, to engage in collective bargaining with labor organizations."[9] Furthermore, the record indicated that "during the strike, where the situation arose, the hyphenates dealt with grievances of employees who worked during the strike, or, in any event, were available to deal with such matters in their normal capacities when and if such grievances arose."[10] It was also found that the hyphenates who reported for duty during the strike performed only their primary functions and did not engage in writing or do any work that had been covered by respondent's collective-bargaining contract. Significantly, none of the hyphenates was charged with violating the strike rule forbidding the performance of writing functions for a struck employer. During the disciplinary hearings, respondent was "not concerned with what work the hyphenates did when working during the strike,"[11] although it would have been quite easy to determine these facts from testimony of union writers about what work was found completed upon their return.

---

writers, and advise the producer concerning writers who should not be retained.

"On a television series, the story editor may participate with the producer in the initial determination of any dispute over screen credits. He also may serve as a buffer between management and the writer, as in ameliorating a writer's distress over material that has been rewritten. . . .

. . . . .

"On the basis of the entire record, it is found that those persons in the television and motion picture industries performing the functions of story editor, story consultant, script consultant, executive story editors, and executive story consultants are supervisors and adjust grievances of employees within the meaning of the Act." *Id.*, at 29a–30a.

[9] *Id.*, at 57a.

[10] *Id.*, at 60a.

[11] *Id.*, at 59a.

The ultimate factual conclusions of the Administrative Law Judge were that the hyphenates were supervisors "selected by their employers to adjust grievances";[12] that in issuing strike rules and engaging in other conduct designed to compel the hyphenates to refrain from working respondent had "restrained and coerced the hyphenates from performing managerial and supervisory services for their employers during the strike, including the adjustment of employee grievances and participation in collective bargaining," and had thus "coerced and restrained those employers in the selection of representatives for collective bargaining and the adjustment of grievances within the meaning of Section 8 (b)(1)(B)";[13] and that by charging, trying, and disciplining the hyphenates who chose to work and who, the Administrative Law Judge found, "performed managerial and supervisory functions including the adjustment of grievances on collective bargaining as required, and did not perform rank and file work," respondent "further coerced and restrained the employers" within the meaning of § 8 (b)(1)(B).[14]

In arriving at these conclusions, the Administrative Law Judge rejected the claim that *Florida Power & Light Co.* v. *Electrical Workers,* 417 U. S. 790 (1974) (*FP&L*), required a contrary result, saying that respondent's conduct "violated the plain meaning of the statute without the necessity of resort to statutory exegesis."[15]

On exceptions and supporting briefs, a majority of a three-member panel of the Board, except in one respect,[16] adopted as its own the rulings, findings, and conclusions of the Admin-

---

[12] *Id.,* at 62a.

[13] *Ibid.*

[14] *Id.,* at 63a.

[15] *Ibid.*

[16] The Board held that there had been a violation with respect to certain hyphenates in addition to those in the categories of producer, director, and story editor.

istrative Law Judge. The Board also reasoned that *FP&L,* which involved supervisors who performed bargaining-unit work, did not extend to cases where union discipline was imposed upon supervisors who performed only their ordinary supervisorial functions (including the adjustment of grievances). The Board relied upon two of its cases decided subsequent to *FP&L: Chicago Typographical Union No. 16 (Hammond Publishers, Inc.),* 216 N. L. R. B. 903 (1975); *New York Typographical Union No. 6, International Typographical Union, AFL–CIO (Daily Racing Form, a subsidiary of Triangle Publishers, Inc.),* 216 N. L. R. B. 896 (1975).

On application to review by the networks and the Board's application to enforce, a divided panel of the Court of Appeals for the Second Circuit denied enforcement in a brief *per curiam* opinion indicating that, like the dissenting member of the Board, it considered *FP&L, supra,* to bar the results reached by the Board in this case. 547 F. 2d 159 (1976). We granted the petitions for certiorari of the Board as well as of the Association and the networks because of an apparent conflict between the decision below and decisions in other Courts of Appeals and because of the recurring nature of the issue.[17] 430 U. S. 982 (1977).

## II

As the Court has set out in greater detail in its comprehensive review of § 8 (b)(1)(B) in *FP&L,* the prohibition against restraining or coercing an employer in the selection of his bargaining representative was, until 1968, applied primarily to pressures exerted by the union directly upon the employer

---

[17] In *Chicago Typographical Union No. 16* v. *NLRB,* 176 U. S. App. D. C. 240, 539 F. 2d 242 (1976), the Court of Appeals for the District of Columbia Circuit enforced the Board's order in *Hammond Publishers,* relied on by the Board in this case. In *Wisconsin River Valley Dist. Council* v. *NLRB,* 532 F. 2d 47 (1976), the Court of Appeals for the Seventh Circuit also took a position seemingly at odds with the judgment under review here. The issue is also a recurring one before the Board.

to force him into a multiemployer bargaining unit or otherwise to dictate or control the choice of his representative for the purpose of collective bargaining or adjusting grievances in the course of administering an existing contract. In *San Francisco-Oakland Mailers' Union No. 18, International Typographical Union (Northwest Publications, Inc.)*, 172 N. L. R. B. 2173 (1968), however, the Board applied the section to prohibit union discipline of one of its member-supervisors for the manner in which he had performed his supervisory task of grievance adjustment. Although the union "sought the substitution of attitudes rather than persons, and may have exerted its pressures upon the [employer] by indirect rather than direct means," the ultimate fact was that the pressure interfered with the employer's control over his representative. "Realistically, the Employer would have to replace its foremen or face *de facto* nonrepresentation by them." *Oakland Mailers, supra*, at 2173.

The application of the section to indirect coercion of employers through pressure applied to supervisory personnel continued to evolve until the *FP&L* and *Illinois Bell* [18] cases reached the Court of Appeals for the District of Columbia Circuit and then this Court. In each of those cases, the union disciplined supervisor-members who had performed rank-and-file work behind a union picket line during a strike. In a companion case to *Illinois Bell*,[19] upon which *Illinois Bell* explicitly relied,[20] the Board found an infraction of § 8 (b)

---

[18] *IBEW, Local 134 v. NLRB*, 159 U. S. App. D. C. 242, 487 F. 2d 1113, rev'd on rehearing en banc, 159 U. S. App. D. C. 272, 487 F. 2d 1143 (1973), refusing to enforce *IBEW, Local 134*, 192 N. L. R. B. 85 (1971) (*Illinois Bell*), and *IBEW Systems Council U–4*, 193 N. L. R. B. 30 (1971) (*FP&L*).

[19] *Local Union No. 2150, IBEW, and Wisconsin Electric Power Co.*, 192 N. L. R. B. 77 (1971).

[20] "We find no discernible difference between the two cases, and for the reasons set forth in that case, we find that, in the instant case, the Union violated Section 8 (b) (1) (B) . . . ." *Illinois Bell*, 192 N. L. R. B., at 86.

(1)(B), broadly construing its purpose "to assure to the employer that its selected collective-bargaining representatives will be completely faithful to its desires" and holding that this could not be achieved "if the union has an effective method, union disciplinary action, by which it can pressure such representatives to deviate from the interests of the employer."[21] In like fashion, in *FP&L*, the Board held that fining supervisors for doing rank-and-file work during a work stoppage "struck at the loyalty an employer should be able to expect from its representatives for the adjustment of grievances and therefore restrained and coerced employers in their selection of such representatives."[22]

The Court of Appeals overturned both decisions of the Board, holding that although the section could be properly applied to union efforts to discipline supervisors for their performance as collective-bargaining or grievance-adjustment representatives, it could not reasonably be applied to prohibit union discipline of supervisors crossing picket lines to perform bargaining-unit work: "When a supervisor forsakes his supervisory role to do rank-and-file work ordinarily the domain of nonsupervisory employees, he is no longer acting as a management representative and no longer merits any immunity from discipline." 159 U. S. App. D. C., at 286, 487 F. 2d, at 1157.

This Court affirmed the judgment of the Court of Appeals:

> "The conclusion is thus inescapable that a union's discipline of one of its members who is a supervisory employee can constitute a violation of § 8 (b)(1)(B) only when that discipline may adversely affect the supervisor's conduct in performing the duties of, and acting in his capacity as, grievance adjuster or collective bargainer on behalf of the employer." 417 U. S., at 804–805.

---

[21] *Id.*, at 78.
[22] 193 N. L. R. B., at 31.

The Court thus rejected the claim that "even if the effect of [union] discipline did not carry over to the performance of the supervisor's grievance adjustment or collective bargaining functions," it was enough to show that the result would be "to deprive the employer of the full allegiance of, and control over, a representative he has selected for grievance adjustment or collective bargaining purposes." *Id.,* at 807. Assuming without deciding that the Board's decision in *Oakland Mailers* fell within the outer reaches of § 8 (b)(1)(B), the Court concluded that the *Illinois Bell* and *FP&L* decisions did not, because it was "certain that these supervisors were not engaged in collective bargaining or grievance adjustment, or in any activities related thereto, when they crossed union picket lines during an economic strike to engage in rank-and-file struck work." 417 U. S., at 805.

Subsequent to *FP&L,* in applying § 8 (b)(1)(B) to cases involving union discipline of supervisor-members, the Board directed its attention, as it understood *FP&L* to require, to the question whether the discipline may adversely affect the supervisor's conduct in performing his grievance-adjustment or collective-bargaining duties on behalf of the employer. In *Hammond Publishers, supra,* and *Triangle Publishers, supra,* the Board held that it was an unfair practice under § 8 (b)(1)(B) for a union to discipline a supervisor-member whose regular duties included the adjustment of grievances for crossing a picket line to perform his regular functions during a strike. See also *Wisconsin River Valley Dist. Council (Skippy Enterprises, Inc.),* 218 N. L. R. B. 1063 (1975). These cases rested on the Board's conclusion that such discipline imposed on the supervisor would have a "carryover" effect and would influence the supervisor in the performance of his adjustment functions after the strike and hence interfere with and coerce the employer in the choice of his grievance representative. See *Triangle,* 216 N. L. R. B., at 897; *Hammond,* 216 N. L. R. B., at 904. The *Triangle* decision

was not challenged in the courts, but *Hammond* was enforced, 176 U. S. App. D. C. 240, 539 F. 2d 242 (1976), as was *Skippy Enterprises,* 532 F. 2d 47 (CA7 1976).[23]

## III

This case was tried to the Administrative Law Judge prior to the issuance of this Court's decision in *FP&L,* but hearings continued and the record was not closed until after the Court of Appeals' final decision in that case; and the *FP&L* opinion here was handed down on June 24, 1974, some three months before the Administrative Law Judge issued his recommended decision. As we have already indicated, the findings of the Administrative Law Judge, accepted by the Board, were that the hyphenates' regular supervisory duties included the performance of grievance adjustment; that the employer insisted that hyphenates return to work but only to perform supervisory, not rank-and-file, duties;[24] and that the hyphenates who reported did only supervisory work and had the

---

[23] In *Hammond* and *Skippy,* the supervisor also performed some rank-and-file work during the strike. The Board in *Hammond* characterized the amount of rank-and-file work as minimal, and only incidental to the supervisory functions, but in *Skippy,* the supervisor performed rank-and-file work for about 30% of his time. In light of the finding that the supervisors performed no rank-and-file writing in this case, we are not presented with that element of the Board's reasoning in *Hammond* and *Skippy.*

[24] We note also respondent's argument that the limited writing duties—the A-to-H functions—normally performed by the hyphenates should be considered rank-and-file work within the meaning of *FP&L.* The Administrative Law Judge gave careful attention to the issue and concluded to the contrary, App. to Pet. for Cert. in No. 76–1162, p. 59a, and the Board accepted his findings and conclusions in this respect. We also find them unexceptionable. The dissenting Board member did not premise his opinion on the A-to-H issue. We thus do not have here the situation where the disciplined supervisor has performed not only supervisory duties, including grievance adjustment, but also has done some rank-and-file tasks. See *Hammond* and *Triangle,* and also *Wisconsin River Valley.*

authority to adjust grievances which they did when the occasion arose.[25] After analyzing this Court's pronouncements in *FP&L*, the Administrative Law Judge rejected the claim that union discipline of a supervisor-member for working during a strike can never be a § 8 (b)(1)(B) violation and went on to hold that under the test prescribed by *FP&L*, there was a violation here. His conclusions were that through its strike rules and other pressures "designed to compel such hyphenates from going to work during the strike," regardless of the tasks that they might perform, the union had "restrained and coerced the hyphenates from performing managerial and supervisory services for their employers during the strike, including the adjustment of employee grievances and participation in collective bargaining . . . ."[26] By "coercing or restraining" hyphenates from going in to do their normal work, which included grievance adjustment, or in the case of producers, on distant location, the task of collective bargaining, the union had "actually coerced and restrained their employers from selecting those persons as the employers' representatives for the adjustment of grievances and for collective bargaining during the strike."[27] He also concluded that by charging, trying, and disciplining those hyphenates who did report for work and by "threatening to blacklist in perpetuity . . . [and] to drive [them] out of the industry,"[28] the union had coerced and restrained these hyphenates from performing their regular

---

[25] It is suggested that there was insufficient proof that the hyphenates who worked actually engaged in grievance adjustment of any kind during the strike. But the findings were to the contrary; and, in any event, there is no question that they were authorized to do so and were available for that purpose when and if the occasion arose. Section 8 (b)(1)(B) obviously can be violated by attempting coercively to control the choice of the employer's representative, before, as well as after, the representative has actually dealt with the grievance.

[26] App. to Pet. for Cert. in No. 76–1162, p. 62a.

[27] *Id.,* at 64a.

[28] *Id.,* at 69a.

duties in the normal manner, including the adjustment of grievances and collective bargaining. The employer, in turn, had been further coerced and restrained in the free selection of those hyphenates as his collective-bargaining and grievance-adjustment representatives.

The Administrative Law Judge thus found the section violated according to the test as elaborated in *FP&L* because, by keeping hyphenates from work, the union had deprived the employer of any opportunity to select those particular supervisors as his grievance-adjusting or collective-bargaining representatives [29] and because disciplining and threatening those supervisors who had reported for duty deprived the employer of fully effective § 8 (b)(1)(B) representatives. Although

---

[29] The Administrative Law Judge reasoned, as follows, in support of his conclusion.

"To illustrate: A person performing the function of a director acts in a managerial or supervisory capacity, which normally includes the adjustment of grievances of actors, actresses, craft employees and others. One occupying the position of a producer normally has a similar capacity and similar duties with respect to employee grievances. In addition, if the film is being shot on distant location the producer has authority to negotiate on the spot agreements with local unions. Thus when Respondent prevented or sought to prevent, such hyphenate members from going to work in their managerial and supervisory capacities as producers and directors during the strike, Respondent obviously coerced and restrained their employers in the selection of those specific producers and directors for the purpose of collective bargaining and the adjustment of grievances of employees working during the strike within the plain meaning of the statute. Similarly, those persons employed as story editors or in like classifications perform executive functions normally, and appear to have done so during the strike, in which the record indicates they were engaged as supervisors and actual or potential representatives of their employers for the adjustment of grievances. Respondent, by coercing or restraining persons in these classifications from going in to do their normal work thereby actually coerced and restrained their employers from selecting those persons as the employers' representatives for the adjustment of grievances and for collective bargaining during the strike." *Id.*, at 63a–64a. (Footnote omitted.)

the Board embraced these findings and conclusions of the Administrative Law Judge,[30] it also found that the disciplinary action taken by the union against those hyphenates who crossed the picket line was an unfair practice under § 8 (b)(1)(B) as that section had been construed in *Hammond* and *Triangle* and that threats of such illegal discipline against others also violated the section.

## IV

We cannot agree with what appears to be the fundamental position of the Court of Appeals and the union that under § 8 (b)(1)(B), as the section was construed in *FP&L*, it is never an unfair practice for a union to discipline a supervisor-member for working during a strike, regardless of the work that he may perform behind the picket line. The opinion in *FP&L* expressly refrained from questioning *Oakland Mailers* or the proposition that an employer could be coerced or restrained within the meaning of § 8 (b)(1)(B) not only by picketing or other direct actions aimed at him but also by debilitating discipline imposed on his collective-bargaining or grievance-adjustment representative. Indeed, after focusing on the purposes of the section, the Court in *FP&L* delineated the boundaries of when that "carryover" effect would violate § 8 (b)(1)(B): whenever such discipline may adversely affect the supervisor's conduct in his capacity as a grievance adjustor or collective bargainer. In these situations—that is, when such impact might be felt—the employer would be deprived of the full services of his representatives and hence would be restrained and coerced in his selection of those representatives.

Furthermore, because this was the test prescribed and employed by the Court to adjudicate the very situation where

---

[30] It is suggested by respondent that the Board did not fully adopt the approach of the Administrative Law Judge, but it is plain that, with the single exception noted above, the Board adopted all of the findings and conclusions of the Administrative Law Judge.

union discipline was imposed for crossing a picket line, it is unlikely that the Court anticipated that the test could *never* be satisfied in such disciplinary cases, that it could *never* be true that the sanction could or would affect the supervisor's collective-bargaining or grievance-adjustment functions, or that the employer in such circumstances could *never* be restrained or coerced in the selection of his representatives.

This is not to say that *every* effort by a union to discipline a supervisor for crossing a picket line to do supervisory rather than rank-and-file work would satisfy the standards specified by *FP&L,* or that on facts present here there is necessarily a violation of § 8 (b)(1)(B). But we are of the view that the Board correctly understood *FP&L* to mean that in ruling upon a § 8 (b)(1)(B) charge growing out of union discipline of a supervisory member who elects to work during a strike, it may—indeed, it must—inquire whether the sanction may adversely affect the supervisor's performance of his collective-bargaining or grievance-adjustment tasks and thereby coerce or restrain the employer contrary to § 8 (b)(1)(B). The Board addressed those issues here, and if its ultimate factual conclusions in this regard are capable of withstanding judicial review, it seems to us that its construction of the section fairly recognizes and respects the outer boundaries established by *FP&L,* and represents an "acceptable reading of the statutory language and a reasonable implementation of the purposes of the relevant statutory sections." *NLRB* v. *Iron Workers,* 434 U. S. 335, 341 (1978).

Respondent objects that this construction of the Act impermissibly intrudes on the union's right to resort to economic sanctions during a strike. However, an employer also has economic rights during a strike, and the statute declares that, in the unrestrained freedom to select a grievance-adjustment and collective-bargaining representative, the employer's rights dominate. Ample leeway is already accorded to a union in permitting it to discipline any member, even a supervisor, for

performing struck work—to carry that power over to the case of purely supervisory work is an inappropriate extension and interference with the employer's prerogative. The Board has so ruled, and as the Court has often observed, " '[t]he function of striking [the] balance to effectuate national labor policy is often a difficult and delicate responsibility, which the Congress committed primarily to the National Labor Relations Board, subject to limited judicial review.' " *NLRB* v. *Iron Workers, supra,* at 350, quoting *NLRB* v. *Truck Drivers,* 353 U. S. 87, 96 (1957); *NLRB* v. *Insurance Agents,* 361 U. S. 477, 499 (1960). Here, in adjudicating as it did the intertwining interests of union, employer, and supervisor-member during an economic strike, we cannot say that the Board has moved into a new area of regulation not committed to it by Congress, *ibid.,* or conclude that the role assumed by the Board is "fundamentally inconsistent with the structure of the Act and the function of the sections relied upon." *American Ship Building Co.* v. *NLRB,* 380 U. S. 300, 318 (1965); *NLRB* v. *Iron Workers, supra.*[31]

## V

We are also unpersuaded that the Board's findings and conclusions are infirm on any of the grounds submitted. First, it is urged that there was an insufficient showing and insufficient findings that any hyphenates were coerced or restrained from reporting for work. But the Administrative Law Judge carefully detailed the strike rules that he expressly found were designed and enforced with the intent of restraining hyphenates from going to work and from performing the normal duties of their positions, which included the adjustment of

---

[31] The Board's decision holding the union responsible under § 8 (b) (1) (B) for the foreseeable course and consequences of its actions is not inconsistent with *Teamsters* v. *NLRB,* 365 U. S. 667 (1961), and *NLRB* v. *News Syndicate Co.,* 365 U. S. 695 (1961). The holding does not rest on any assumption that the union will act illegally in the future.

grievances.[32] It was also found that the hyphenates were especially vulnerable to pressure from the union and that many of them were actually restrained and prevented from performing their normal duties, including the adjustment of grievances. These are sufficiently clear findings that union pressures kept many hyphenates from the job, and, on the record before us, it approaches the frivolous to argue that there is insufficient evidence to support them. It also follows, as the Administrative Law Judge and the Board concluded, that as to those hyphenates whom the union kept from work, the employer was restrained and coerced within the meaning of § 8 (b)(1)(B) by being totally deprived of the opportunity to choose these particular supervisors as his collective-bargaining or grievance-adjustment representatives during the strike.

Second, as to those hyphenates who reported for work, it is strenuously urged that there is no basis for concluding that the discipline imposed upon them would adversely affect the performance of their grievance-adjustment duties either during or after the strike. Again, however, we are unwilling to differ with the Board in these respects. The inquiry whether union conduct would or might adversely affect the performance of the hyphenates' grievance-adjustment duties is, as petitioners assert, necessarily a matter of probabilities, and its resolution depends much on what experience would suggest are the justifiable inferences from the known facts. This seems to us to be peculiarly the kind of determination that Congress has assigned to the Board:

"An administrative agency with power after hearings to

---

[32] The findings were also that:

"The record is convincing that Respondent, well aware of the primary supervisory, management, and executive functions of its hyphenate-members, drafted its strike rules and enforced them with the intent of compelling those hyphenate-members from going to work during the strike, without regard to the capacity in which they performed or the work done." App. to Pet. for Cert. in No. 76–1162, p. 69a.

determine on the evidence in adversary proceedings whether violations of statutory commands have occurred may infer within the limits of the inquiry from the proven facts such conclusions as reasonably may be based upon the facts proven. One of the purposes which lead to the creation of such boards is to have decisions based upon evidential facts under the particular statute made by experienced officials with an adequate appreciation of the complexities of the subject which is entrusted to their administration." *Republic Aviation Corp.* v. *NLRB,* 324 U. S. 793, 800 (1945); *Radio Officers* v. *NLRB,* 347 U. S. 17, 48–49 (1954).

See also *NLRB* v. *Erie Resistor Corp.,* 373 U. S. 221, 227 (1963); *Teamsters* v. *NLRB,* 365 U. S. 667, 675 (1961). The Board's findings are "entitled to the greatest deference in recognition of its special competence in dealing with labor problems." *American Ship Building Co.* v. *NLRB, supra,* at 316.

Furthermore, it does not strike us as groundless or lacking substantial evidence for the Board to conclude on this record that the discipline imposed would have the necessary adverse effect. Strike rules were distributed in February; the strikes against the Association began on March 4 and terminated June 24; the strikes against the networks began on March 29 and ended on July 12. Between April 6 and November 8— both during and after the strikes—some 31 hyphenates who had worked during the strikes were charged with violating union rules,[33] 15 hearings had been held prior to the closing of evidence in November 1973, and from June 25 to September 28, very substantial penalties were imposed in 10 cases although 9 have already been reduced on appeal. These penalties were widely publicized at the time of their imposi-

---

[33] Violations of Rules 1, 12, 13, and 28 were alleged. See, *supra,* at 415, 416, 417, and n. 3.

tion. Other charges were pending and remained to be tried when the record was closed in this case.

These penalties were meted out at least in part because the accused hyphenates had complied with the orders of their employers by reporting for work and performing only their normal supervisory functions, including the adjustment of grievances, during the strike. Hyphenates who worked were thus faced not only with threats but also with the *actuality* of charges, trial, and severe discipline simply because they were working at their normal jobs. And if this were not enough, they were threatened with a union blacklist that might drive them from the industry. How long such hyphenates would remain on the job under such pressure was a matter no one, particularly the employer, could predict.

Moreover, after the strike, with the writers back at work, the hyphenates who had worked during the strike still faced charges and trials or were appealing large fines and long suspensions. At the same time, they were expected to perform their regular supervisory duties and to adjust grievances whenever the occasion demanded, functions requiring them to deal with the same union which was considering the appeal of their personal sanctions. As to these supervisors, who had felt the union's wrath, not for doing rank-and-file work contrary to union rules, but for performing only their primary supervisory duties during the strike and who were in a continuing controversy with the union, it was not untenable for the Board to conclude that these disciplined hyphenates had a diminished capacity to carry out their grievance-adjustment duties effectively and that the employer was deprived of the full range of services from his supervisors.[34] Such a hyphenate

---

[34] In determining that the Board had exceeded the limitations of the statute in the *FP&L* and *Illinois Bell* cases, the Court of Appeals for the District of Columbia Circuit recognized that when a supervisor acts as a grievance adjustor, "he is a representative of management, and as such he should be immune from union discipline. The unions participating in the present cases conceded as much at oral argument when they agreed that

might be tempted to give the union side of a grievance a more favorable slant while the threat of discipline remained, or while his own appeal of a union sanction was pending. At the very least, the employer could not be certain that a fined hyphenate would willingly answer the employer's call to duty during a subsequent work stoppage, particularly if it occurred in the near future.[35] For an employer in these circumstances to insure having satisfactory collective-bargaining and grievance-adjustment services would require a change in his representative.

As the Board has construed the Act from *Oakland Mailers* to *Triangle, Hammond,* and the cases now before us, such a likely impact on the employer constitutes sufficient restraint and coercion in connection with the selection of collective-bargaining and grievance-adjustment representatives to vio-

---

when a supervisor crosses a picket line to perform *supervisory* work he remains immune from discipline. . . . The dividing line between supervisory and nonsupervisory work in the present context is sharply defined and easily understood." 159 U. S. App. D. C., at 286, 487 F. 2d, at 1157.

As the Court of Appeals for the Seventh Circuit said:

"[W]here supervisors cross picket lines to perform rank-and-file struck work, union discipline does not violate Section 8 (b) (1) (B) since it merely deprives the employer of services normally rendered by strikebreaking replacement employees." *Skippy Enterprises,* 532 F. 2d 47, 53 (1976). On the other hand,

"Where supervisors cross picket lines to perform regular supervisory duties, union discipline violates Section 8 (b) (1) (B) since it tends to deprive the employer of its supervisors' services—including their § 8 (b) (1) (B) services—and because the supervisors would reasonably anticipate that union discipline would also be imposed if future performance of their § 8 (b) (1) (B) functions did not meet with union approval." *Ibid.*

[35] Union discipline might even result in depriving the employer of the supervisors' services forever, if the blacklist involved in this case had been successful. The employer would have had no choice but to let the hyphenate go, since the positions of director, producer, and script editor unavoidably require working with rank-and-file writers.

late § 8 (b) (1) (B). In *FP&L* the Court declined the invitation to overrule *Oakland Mailers,* and we do so again. Union pressure on supervisors can affect either their willingness to serve as grievance adjustors or collective bargainers, or the manner in which they fulfill these functions; and either effect impermissibly coerces the employer in his choice of representative.[36]

Third, it is further urged that union discipline could not adversely affect a supervisor's later performance of his § 8 (b) (1) (B) duties because the employer could require him to leave the union and thus free himself from further threats of union discipline. This submission has little force in this case, since, as the Administrative Law Judge found, the union's known policy was not to permit a member to resign during a strike and for a period of six months thereafter. For the entire period to which the Board's findings were addressed, hyphenates could not terminate their membership, and the

---

[36] In the *FP&L* and *Illinois Bell* cases, the Court of Appeals for the District of Columbia Circuit noted that its consistent view has been that the "basic rationale [of *Oakland Mailers*] is consistent with the purposes of Section 8 (b) (1) (B) . . . [for] management's right to a free selection would be hollow indeed if the union could dictate the manner in which the selected representative performed his collective bargaining and grievance adjustment duties." 159 U. S. App. D. C., at 282, 283, 487 F. 2d, at 1153, 1154. The court also noted its agreement with *New Mexico District Council of Carpenters and Joiners of America ( A. S. Horner, Inc.),* 177 N. L. R. B. 500 (1969), enf'd, 454 F. 2d 1116 (CA10 1972), where a union member worked as a supervisor for a company which had no contract with the union. 159 U. S. App. D. C., at 284 n. 19, 487 F. 2d, at 1155 n. 19. A fine imposed in these circumstances violated the section because compliance by the supervisor with the union's demands would have required his leaving his job and thus have "the effect of depriving the Company of the services of its selected representative for the purposes of collective bargaining or the adjustment of grievances." 177 N. L. R. B., at 502. The Court of Appeals said that *A. S. Horner* "thus falls close to the original rationale of § 8 (b) (1) (B) which was to permit the employer to keep the bargaining representative of his own choosing." 159 U. S. App. D. C., at 284 n. 19, 487 F. 2d., at 1155 n. 19.

employer's only recourse would have been to replace them as his grievance representatives.

Carried to its logical end, this submission is simply another argument that union sanctions applied to supervisor-members who work during a strike can never violate § 8 (b) (1) (B), because the employer could always insist that his supervisors either terminate union affiliation or face discharge. Yet, as we have noted, the test posited by this Court in *FP&L* plainly recognizes the possibility of a § 8 (b) (1) (B) violation arising from union fines imposed during a strike. Moreover, if the argument were to be accepted, indirect pressures on the employer by sanctioning supervisor-members for the manner in which they perform their grievance-adjusting function (as in *Oakland Mailers*) would never be a violation because the supervisor could, at the employer's request, escape from union threats and sanctions. The Board's construction of the Act is to the contrary, however, and, as we have said, we are not prepared at this juncture to override it.[37]

---

[37] It is also argued that at the very least the Board erred with respect to director-hyphenates because there is no evidence and no finding that directors ever dealt with writers or adjusted their grievances even if producers and story editors did. Hence, it is alleged that union discipline of directors could not possibly affect their adjustment of writers' grievances during or after the strike for the simple reason that they had none to adjust. But during the strike, no supervisor, writer, director, producer, or story editor had writer grievances to adjust—at least no new grievances—because there were no writers on the job and only the possibility that there might be replacements or a few strikebreakers. Nevertheless, directors, as well as others, had adjustment duties with respect to other employees. The Administrative Law Judge found that directors

"hire or effectively recommend the employment of crew and actors, effectively direct such employees, and . . . have authority to and do adjust grievances of such employees." App. to Pet. for Cert. in No. 76–1162, p. 28a.

Directors' willingness to work and to perform these duties subjected them to sanctions and financial loss, making them less than completely reliable and effective employer representatives for the duration of the strike, and

Because we have concluded that the Board's construction of § 8 (b) (1) (B) is not an unreasonable reading of its language or inconsistent with its purposes, and because we cannot say that the Board's findings lacked substantial evidence, we must reverse the judgment of the Court of Appeals.

*So ordered.*

MR. JUSTICE STEWART, with whom MR. JUSTICE BRENNAN, MR. JUSTICE MARSHALL, and MR. JUSTICE STEVENS join, dissenting.

The Court holds today that a labor union locked in a direct economic confrontation with an employer is powerless to impose sanctions on its own members who choose to pledge their loyalty to the adversary. Nothing in § 8 (b)(1)(B) or any other provision of the National Labor Relations Act permits such a radical alteration of the natural balance of

less likely to perform any supervisory task during future strikes. A union may no more interfere with the employer's choice of a grievance representative with respect to employees represented by other unions than with respect to those employees whom it itself represents. *International Organization of Masters, Mates and Pilots, International Marine Division,* 197 N. L. R. B. 400 (1972), enf'd, 159 U. S. App. D. C. 11, 14, 486 F. 2d 1271, 1274 (1973), cert. denied, 416 U. S. 956 (1974), and *International Organization of Masters, Mates and Pilots* v. *NLRB,* 539 F. 2d 554, 559–560 (CA5 1976). We note also that all hyphenates, including directors, were threatened with a permanent blacklist—a refusal by other Guild members, including producers, other directors, and story editors, as well as writers, to work with the offending director—and that revocation of the formal rule on April 30 did not completely remove the threat. Because of his central role, refusal to work with a director means refusal to participate at all in a particular film. The union thus threatened a strike by all of its members against the employer who permitted director-hyphenates to work, plainly an independent violation of § 8 (b) (1) (B). The Administrative Law Judge found that of the 15 union members employed as directors by petitioners, 3 were charged with strike rule violations, and 1 was brought before a trial panel and disciplined. App. to Pet. for Cert. in No. 76–1162, p. 29a.

power between labor and management. I therefore respectfully dissent.

A union's ability to maintain a unified front in its confrontations with management and to impose disciplinary sanctions on those who "adher[e] to the enemy in time of struggle" are essential to its survival as an effective organization. See Summers, Legal Limitations on Union Discipline, 64 Harv. L. Rev. 1049, 1066 (1951). An employer also has an interest in securing the loyalty of those who represent him in dealings with the union, and that interest is protected by specific provisions of the Act.[1] Thus, as the Court observed in *Florida Power & Light Co.* v. *Electrical Workers,* 417 U. S. 790 *(FP&L),* very real concerns are raised on both sides when supervisory employees with collective-bargaining and grievance-adjustment responsibilities are also union members. But § 8 (b)(1)(B) is not "any part of the solution to the generalized problem of supervisor-member conflict of loyalties." 417 U. S., at 813.

That statutory provision was enacted for the primary purpose of prohibiting a union from exerting direct pressure on an employer to force him into a multiemployer bargaining unit or to dictate his choice of representatives for the settlement of employee grievances. S. Rep. No. 105, 80th Cong., 1st Sess., pt. 1, p. 21 (1947). The Court in *FP&L* reserved decision on whether union pressure expressly aimed at affecting the *manner* in which supervisor-members performed their collective-bargaining or grievance-adjustment functions might

---

[1] This interest is protected by § 2 (3) of the National Labor Relations Act, which excludes "supervisors" as defined in § 2 (11) from the definition of "employees," thereby excluding them from the coverage of the Act. Thus an employer may discharge or otherwise penalize a supervisory employee for engaging in what would otherwise be protected concerted activity under the Act. In addition, § 14 (a) of the Act provides that "no employer . . . shall be compelled to deem . . . supervisors as employees for the purpose of any law . . . relating to collective bargaining." See *Florida Power & Light Co.* v. *Electrical Workers,* 417 U. S. 790, 808–811.

fall within the "outer limits" of the proscription of § 8 (b) (1)(B). 417 U. S., at 805. See *San Francisco-Oakland Mailers' Union No. 18 (Northwest Publications, Inc.)*, 172 N. L. R. B. 2173. But it flatly rejected the argument that union discipline aimed at enforcing uniform rules violated § 8 (b)(1)(B) simply because it might have the ancillary effect of "depriv[ing] the employer of the full allegiance of, and control over, a representative he has selected for grievance adjustment or collective bargaining purposes." 417 U. S., at 807.

In the present cases it is entirely clear that the union had no interest in restraining or coercing the employers in the *selection* of their bargaining or grievance-adjustment representatives, or in affecting the *manner* in which supervisory employees performed those functions. As the Court notes, *ante,* at 417–418, and n. 6, the union expressed no interest at the disciplinary trials in the kind of work that was done behind its picket lines. Its sole purpose was to enforce the traditional kinds of rules that every union relies on to maintain its organization and solidarity in the face of the potential hardship of a strike. Cf. *NLRB* v. *Allis-Chalmers Mfg. Co.,* 388 U. S. 175, 181–184.

In reversing the judgment of the Court of Appeals, this Court today forbids a union from disciplining a supervisor-member who crosses its picket line—who clearly gives "aid and comfort to the enemy" during a strike, see Summers, *supra,* at 1066—solely because that action may have the incidental effect of depriving the employer of the hypothetical grievance-adjustment services of that particular supervisor for the duration of the strike. This ruling quite simply gives the employer the superior right .to call on the loyalty of *any* supervisor with grievance-adjustment responsibilities,[2] when-

---

[2] Since the power to adjust employee grievances is one of the statutory indicia of supervisory status under § 2 (11) of the Act, many if not most

ever the union to which the supervisor belongs calls him out on strike. In short, the Court's decision prevents a union with supervisory members from effectively calling and enforcing a strike.[3]

Nothing in § 8 (b)(1)(B) permits such a sweeping limitation on the choice of economic weapons by unions that include supervisory employees among their members. On the contrary, as the Court clearly held in *FP&L, supra,* an employer's remedy if he does not want to share the loyalty of his supervisors with a union is to insist that his supervisory personnel not belong to a union; or if he does not welcome the consequences of his supervisors' union membership he may legally penalize them for engaging in union activities, see n. 1, *supra,* or "resolv[e] such conflicts as arise through the traditional procedures of collective bargaining." *FP&L, supra,* at 813.[4]

The sole function of § 8 (b)(1)(B) is to protect an employer from any union coercion of the free choice of his bargaining or grievance-adjustment representative. In prohibiting union interference in his choice of representatives for dealings with the union, this statutory provision does not in any

---

supervisory employees will fall within the Court's ruling when they are "restrain[ed] . . . from going to work and from performing the normal duties of their positions, which includ[e] the adjustment of grievances." *Ante,* at 431–432.

[3] Under this rule, it would appear that a separate union consisting entirely of supervisory employees would commit an unfair labor practice if it ordered its members not to cross the picket lines of another union, or indeed, if it called an economic strike entirely on its own, since the employer would thereby be deprived of the services of his chosen grievance-adjustment representatives.

[4] Alternatively, the employer may ease the dilemma of his supervisory employees by offering to provide their defense or to indemnify them against any fines that might be imposed by the union for a breach of strike discipline. Several of the employers in this case did in fact extend such offers to the hyphenates. See decision of the Administrative Law Judge, App. to Pet. for Cert. in No. 76–1162, p. 42a.

way grant him a right to interfere in the union's relationship with its supervisor-members.[5] The statute leaves the balance of power in equipoise. The Court's decision, by contrast, tips it measurably in favor of the employer at the most delicate point of direct confrontation, by completely preventing the union from enlisting the aid of its supervisor-members in a strike effort. It seems to me that the Court's reading of § 8 (b)(1)(B) is "fundamentally inconsistent with the structure of the Act and the function of the sections relied upon." *American Ship Building Co.* v. *NLRB,* 380 U. S. 300, 318.

Accordingly, I would affirm the judgment of the Court of Appeals.

---

[5] In *San Francisco-Oakland Mailers Union No. 18 (Northwest Publications, Inc.),* 172 N. L. R. B. 2173, the Board found a violation of § 8 (b)(1)(B) when a union expelled member-foremen for allegedly assigning bargaining-unit work in violation of the collective-bargaining agreement. It reasoned that the employer's statutory right to choose his bargaining representative would be rendered illusory if the union could effectively control the actions of any individual who happened to occupy the position. I adhere to the view expressed by the Court in *FP&L,* 417 U. S., at 805, that this ruling is at best within the "outer limits" of § 8 (b)(1)(B).