599 F.2d 5
 101 L.R.R.M. (BNA) 2413, 86 Lab.Cas. P 11,316
 NATIONAL LABOR RELATIONS BOARD, Petitioner,
and
New England Telephone and Telegraph Company, Intervenor,
v.
SYSTEM COUNCIL T-6, INTERNATIONAL BROTHERHOOD OF ELECTRICAL
WORKERS et al., Respondents.
 No. 78-1396.
 United States Court of Appeals,
First Circuit.
 Argued April 13, 1979.
Decided May 22, 1979.
 
 David F. Zorensky, Atty., Washington, D.C., with whom John S. Irving, Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Robert E. Allen, Acting Associate Gen. Counsel, Elliott Moore, Deputy Associate Gen. Counsel, and Howard E. Perlstein, Atty., Washington, D.C., were on brief for petitioner.
 James O. Hall, Boston, Mass., with whom Angoff, Goldman, Manning, Pyle & Wanger, Boston, Mass., was on brief for respondents.
 Joseph C. D'Arrigo, Boston, Mass., with whom C. Duane Aldrich, and William J. McDonald, Boston, Mass., were on brief for intervenor.
 Before ALDRICH and CAMPBELL, Circuit Judges, JULIAN, District Judge.*
 ALDRICH, Senior Circuit Judge.
 
 
 1
 Respondent unions[1] collectively represent some 30,000 employees of New England Telephone & Telegraph Co. in the company's plant, traffic and accounting departments under an agency shop arrangement.[2] This labor dispute began in October, 1974 when respondents, without notice to, or bargaining with, the company, adopted a union rule prohibiting union members[3] from accepting temporary management assignments to supervisory positions. After a hearing on charges brought by the company, the ALJ found the company to have a right implicitly recognized in the then current collective bargaining agreements to make such assignments. From this he concluded that respondents' unilateral adoption of the rule violated their duty to bargain collectively under sections 8(b)(3) and 8(d) of the Act;[4] that their enforcement of the ban against union members through disciplinary action violated section 8(b)(1)(A);[5] and that the rule violated section 8(b)(1) (B)[6] in that it restrained and coerced the company in its selection of supervisors whose duties include grievance adjustment. A three member panel of the Board, one member dissenting, affirmed the decision of the ALJ in all significant respects.[7] 236 N.L.R.B. No. 143 (1978).
 
 
 2
 The record consists almost entirely of a written stipulation and documentary evidence, and the material facts are essentially undisputed. For many years prior to the events in question the company has had the practice of assigning bargaining unit employees on a voluntary basis to first level supervisory positions. These assignments fill temporary personnel needs, afford the company opportunity to assess the employee's supervisory potential and give employees experience and compensation as such. The duties of these positions include the adjustment of employee grievances. After acquiring bargaining rights for the company's traffic, plant and accounting employees in 1970, respondents entered into collective bargaining agreements with the company covering those three units, in 1971 and 1974, the latter in effect at the time respondents instituted the rule challenged here. The prior and current contracts contained provisions relating to the company's right to make temporary supervisory assignments. First, a "management rights" clause provided that, subject only to the limitations contained in the agreements, the company "retains the exclusive right . . . to assign and direct the work force . . . ." Second, the plant and accounting unit contracts each contain seniority provisions stating, "Time spent on any temporary management assignment in excess of ninety (90) calendar days is excluded from computation of bargaining unit seniority." The traffic employees' contract contains no such provision, but the subject of temporary supervisory assignments for those employees was addressed by a 1973 arbitration award. The arbitrator found that the traffic unit contract did not bar employees from accepting the assignments, but that no bargaining unit seniority accrued during such. During the 1974 contract negotiations, the company proposed a seniority provision similar to that in the plant and accounting agreements. Respondents, however, insisted that the award remain in effect and the company agreed.
 
 
 3
 The record also contains testimony, credited by the ALJ and essentially undisputed, of a company negotiator that during the 1971 contract negotiations a union representative had conceded that respondents had "no say" in who the company selected for temporary management posts. Additionally, respondents here stipulate their acknowledgement of the company's right to appoint bargaining unit members to such positions.
 
 
 4
 Respondents, nonetheless, maintain that they have the right from time to time to prohibit union members from accepting management assignments and point to several occasions prior to October 1974 when such a ban was instituted without formal protest from the company. It is conceded, however, that on each of those occasions, including the present one, respondents failed officially to notify the company or request bargaining with it over the ban.
 
 
 5
 As a result of respondents' October, 1974 action, company employees relinquished these temporary promotions, others refused to accept them and union members were threatened with, or actually subjected to, disciplinary action for failure to comply.
 
 
 6
 On this record, the Board found a "firm (if implied) contractual acknowledgement (by respondents) of the Company's right to appoint bargaining unit employees to temporary supervisory positions" which respondents could not, without violating the Act, unilaterally alter. While we might agree with respondents and the dissenting member of the Board that such a conclusion may not be compelled, this is not the test. Although the meaning of a contract may sometimes present a pure question of law, the issue here was basically factual. Cf. United Truck & Bus Service Co. v. Piggott, 1 Cir., 1976, 543 F.2d 949, 950; Martin v. Vector Co., 1 Cir., 1974, 498 F.2d 16, 22. Our review, accordingly, is limited to a determination whether there is substantial evidence on the record as a whole to support the Board's findings, and no clear error. The clear error test applies even where, as here, the evidence is essentially documentary and undisputed, See, e. g., Sarah Coventry, Inc. v. T. Sardelli & Sons, Inc., 1 Cir., 1975, 526 F.2d 20, 22, Cert. denied 426 U.S. 920, 96 S.Ct. 2626, 49 L.Ed.2d 374; Local 1219, United Bro. of Carpenters v. United Bro. of Carpenters, 1 Cir., 1974, 493 F.2d 93, 96; and where the Board has simply drawn inferences as to the parties' implicit understanding from the terms of the agreements and their prior dealing. See United Truck & Bus Service Co. v. Piggott, ante; Martin v. Vector Co., ante; Cf. NLRB v. Communications Workers Local 1170, 2 Cir., 1972, 474 F.2d 778, Enf'g 194 N.L.R.B. 872.
 
 
 7
 Against this standard, we cannot say that the Board's conclusions were unwarranted. In light of the company's long-time practice, recognized in the 1973 arbitration award, of making temporary assignments in substantial numbers,[8] it was not unreasonable to infer from the references to such assignments in the award and the collective bargaining contracts a recognition by respondents of the company's right to make them. See NLRB v. Communications Workers Local 1170, ante. Indeed, respondents concede the company's right, but assert a corresponding right in themselves to prohibit their members, from time to time, from accepting assignments. This would smack of the mother who told her daughter she could go out to swim but not to go near the water, but for the fact that under the agency shop there were employees who did not belong to the union, and hence were not bound by the prohibition, and any union member could, similarly, avoid discipline by resigning his membership. Given the relatively small number of non-union employees, however, the Board was warranted in rejecting respondents' construction as an unreasonable restriction on the company's acknowledged right.[9] Cf. American Broadcasting Cos. v. Writers Guide, 1978, 437 U.S. 411, 436-37, 98 S.Ct. 2423, 57 L.Ed.2d 313. We conclude that the Board justifiably found respondents to have violated sections 8(b)(3) and 8(d).[10]
 
 
 8
 The propriety of the finding of other labor law violations follows from that of the section 8(b)(3) charge. Section 8(b)(1)(A) makes it unlawful for a union to "restrain or coerce . . . employees in the exercise of rights guaranteed by section 157 . . . ." This section, as construed by the Court, "leaves a union free to enforce a properly adopted rule which reflects a legitimate union interest, impairs no policy Congress has imbedded in the labor laws, and is reasonably enforced against union members who are free to leave the union and escape the rule." Scofield v. NLRB, 1969, 394 U.S. 423, 430, 89 S.Ct. 1154, 1158, 22 L.Ed.2d 385. If, however, a union rule "invades or frustrates an overriding policy of the labor laws the rule may not be enforced, even by fine or expulsion, without violating § 8(b)(1)." Id., at 429, 89 S.Ct. at 1158. We agree with respondents that the use of union members as supervisors may create problems of divided loyalties and thus be a matter of legitimate union interest. See Florida Power & Light Co. v. IBEW Local 641, 1974, 417 U.S. 790, 805-07, 813, 94 S.Ct. 2737, 41 L.Ed.2d 477. However, respondents' unilateral attempt to deal with the problem abridged the company's collective bargaining rights under section 8(b)(3), thereby frustrating overriding labor law policy and hence ran afoul of section 8(b)(1) (A). NLRB v. Communications Workers Local 1170, ante, at 782; Communications Workers Local 1122, 1976, 226 N.L.R.B. 97, 98-99, Enf'd mem., 2 Cir., 1977, 562 F.2d 37.
 
 
 9
 Finally, respondents' institution and enforcement of the rule against temporary management assignments was also held to violate section 8(b)(1)(B), which prohibits coercion or restraint of an employer in its selection of collective bargaining or grievance adjustment representatives. Union discipline of member-supervisors may violate this section when it adversely affects a supervisor in his willingness to perform, or actual performance of, those duties and thereby indirectly restrains the employer. See American Broadcasting Cos. v. Writers Guild, ante, 437 U.S. at 429-30, 98 S.Ct. 2423; Florida Power & Light Co. v. IBEW Local 641, ante, 417 U.S. at 804-05, 94 S.Ct. 2737. It is stipulated that employees on temporary management assignment serve as grievance adjusters and it is clear that the union rule affects the performance of supervisory duties generally, including that function, rather than merely penalizing for performing nonsupervisory tasks. See American Broadcasting Cos. v. Writers Guild, ante, 437 U.S. at 426 & n. 24, 98 S.Ct. 2423; Compare Florida Power & Light Co. v. IBEW Local 641, ante. As a result of respondents' rule, employees refused or resigned supervisory assignments under threat of union discipline and some who did not were punished. These effects constituted restraint on the company sufficient to invoke section 8(b) (1)(B). See American Broadcasting Cos. v. Writers Guild, ante; Communications Workers Local 1122, ante.
 
 
 10
 The order of the Board will be enforced.
 
 
 
 *
 Sitting by designation
 
 
 [1]
 Respondents are System Council T-6, IBEW, and Locals 2222, 2313, 2315, and 2320-27, IBEW
 
 
 [2]
 An agency shop is one in which the employer has a bargaining agreement with a union under which individual employees need not join the union, but must pay the initiation fee, annual dues, and other membership assessments, but as non-members are not subject to fines or other disciplines. Cf. NLRB v. General Motors Corp., 1963, 373 U.S. 734, 83 S.Ct. 1453, 10 L.Ed.2d 670
 
 
 [3]
 The record does not reveal how many employees in the three bargaining units are union members, but we accept an uncontradicted statement made at oral argument of approximately 90%
 
 
 [4]
 Section 8(b)(3) makes it an unfair labor practice for a union to "refuse to bargain collectively with an employer . . . ." 29 U.S.C. § 158(b)(3) (1976). Section 8(d), which defines the union's bargaining obligation, provides in material part:
 . . . where there is in effect a collective-bargaining contract . . . the duty to bargain collectively shall also mean that no party to such a contract shall terminate or modify such contract, unless the party desiring such termination or modification
 (1) serves a written notice upon the other party to the contract of the proposed termination or modification sixty days prior to the expiration date thereof . . . ;
 (2) offers to meet and confer with the other party for the purpose of negotiating a new contract or a contract containing the proposed modifications;
 (4) continues in full force and effect, without resorting to strike or lock-out, all the terms and conditions of the existing contract for a period of sixty days after such notice is given or until the expiration date of such contract, whichever occurs later:
 (T)he duties so imposed shall not be construed as requiring either party to discuss or agree to any modification of the terms and conditions contained in a contract for a fixed period, if such modification is to become effective before such terms and conditions can be reopened under the provisions of the contract.
 
 
 [5]
 "It shall be an unfair labor practice for a labor organization . . . to restrain or coerce . . . employees in the exercise of the rights guaranteed in section 157 of this title: Provided, That this paragraph shall not impair the right of a labor organization to prescribe its own rules with respect to the acquisition or retention of membership therein . . . ." 29 U.S.C. § 158(b)(1) (A) (1976)
 
 
 [6]
 "It shall be an unfair labor practice for a labor organization . . . to restrain or coerce . . . an employer in the selection of his representatives for the purposes of collective bargaining or the adjustment of grievances . . . ." 29 U.S.C. § 158(b)(1)(B) (1976)
 
 
 [7]
 The Board further found that even if the company had no contractual right to make the temporary assignments, there was a common and established practice for it to do so, which respondents could not alter unilaterally without violating their statutory bargaining duties. As we conclude that the Board was warranted in finding a contractually based right, we need not pass on this alternate ground
 With regard to respondents' challenge to the Board's back pay order, we note only that we find no abuse of the Board's substantial remedial discretion, See, e. g., Fibreboard Paper Prods. Corp. v. NLRB, 1964, 379 U.S. 203, 216, 85 S.Ct. 398, 13 L.Ed.2d 233, and that uncertainty as to the application of the order may be resolved in subsequent compliance proceedings. See NLRB v. Otis Hospital, 1 Cir., 1976, 545 F.2d 252, 257.
 
 
 [8]
 The record is silent as to the precise number of such assignments. The arbitration award, however, which, by stipulation, is part of the record here, recited that for two four-month periods during 1971 and 1972, the company made an average of 120 assignments per month
 
 
 [9]
 The absence of any contractual recognition of the employer's right to make temporary supervisory assignments, as well as the fact that the rule there at issue merely terminated union membership during such assignments without penalty to the employee, distinguishes National Ass'n of Letter Carriers, 1979, 240 N.L.R.B. No. 68, from this case. See id., slip op., at 19 & n. 28
 
 
 [10]
 That the company on several occasions prior to October, 1974 did not protest the imposition of similar bans does not require a different result, Cf. Communications Workers Local 1122, 1976, 226 N.L.R.B. 97, 98, especially since respondents failed on those occasions formally to notify the company of its actions. Plainly, the company's inaction in the past was not the sort of "clear and unmistakable" expression required for a finding of waiver. See NLRB v. Die Supply Corp., 1 Cir., 1968, 393 F.2d 462, 467